# EXHIBIT A
*State Court Documents*

# EXHIBIT A
*State Court Documents*

Electronically Filed
10/3/2024 2:57 PM
Steven D. Grierson
CLERK OF THE COURT

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
8335 West Flamingo Road
Las Vegas, Nevada 89147
Telephone:    (702) 776-3333
Facsimile:    (702) 505-9787
*E-Mail:*      *service@the702firm.com*

CASE NO.: A-24-903147-C

Department 14

## DISTRICT COURT
## CLARK COUNTY, NEVADA

MARCY C., pseudonymously,

    Plaintiff,

vs.

MGM RESORTS INTERNATIONAL;
THE MIRAGE CASINO-HOTEL, LLC;
NEW CASTLE, LLC;
TREASURE ISLAND LV, LLC;
PHILLIP E. RUFFIN;
CAESAR'S ENTERTAINMENT, INC.;
DESERT PALACE, LLC;
PARBALL NEWCO, LLC;
PHW LAS VEGAS, LLC;
PHW MANAGER, LLC;
RIO PROPERTIES, LLC;
LAS VEGAS SANDS CORP.;
WYNN LAS VEGAS, LLC;
EXTENDED STAY AMERICA, INC;
ESA P PORTFOLIO L.L.C.;
ESA P PORTFOLIO OPERATING LESSEE LLC;
RED LION HOTELS CORPORATION;
SONESTA INTERNATIONAL HOTELS
CORPORATION;
WHC816, LLC;
RL SALT LAKE, LLC;
CHOICE HOTELS INTERNATIONAL, INC.;
SALT LAKE LODGING;
CRRC PROPERTIES, LLC;
LA QUINTA FRANCHISING, LLC;
CPLG PROPERTIES, LLC,

    Defendants.

Case No. :

Dept. No. :

**COMPLAINT**
**HUMAN TRAFFICKING**
**under NRS § 41.13965,**
**NRS § 41.1399, and**
**18 U.S.C. § 1595**

**EXEMPT FROM ARBITRATION:**
**Exemption Claimed: Probable Jury**
**Award Exceeds $50,000**

**Jury Trial Demanded**

Plaintiff MARCY C., by and through her attorneys, MICHAEL C. KANE, ESQ., BRADLEY J. MYERS, ESQ., and JOEL S. HENGSTLER, ESQ. of THE702FIRM, states as follows:

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

1

**PARTIES**

1. Plaintiff MARCY C. ("**Marcy**") is a natural person residing in Clark County, NV.

2. Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order under Nevada Rule of Civil Procedure 26(c): (1) permitting her to proceed under the pseudonym "MARCY C."; and (2) forbidding the parties from disclosing her identity to third parties without either her consent or the prior approval of the Court.

3. Defendant MGM RESORTS INTERNATIONAL ("**MGM**") is a Delaware corporation with its principal place of business in Clark County, NV. On information and belief, MGM operated the Mirage Las Vegas ("the Mirage") and the Excalibur Las Vegas ("the Excalibur") casino resorts at all relevant times.

4. Defendant THE MIRAGE CASINO-HOTEL, LLC ("**MCH**") is a Nevada limited liability company with its principal place of business in Clark County, NV. On reference, MCH is a subsidiary of MGM and is the successor-in-interest of the defunct corporation, THE MIRAGE CASINO-HOTEL. If MGM did not directly operate the Mirage at all relevant times, then, on information and belief, THE MIRAGE CASINO-HOTEL operated the Mirage at all relevant times and MCH is liable as its successor-in-interest.

5. Defendant NEW CASTLE, LLC ("**New Castle**") is a Nevada limited liability company with its principal place of business in Clark County, NV. On reference, New Castle is a subsidiary of MGM. If MGM did not directly operate the Excalibur at the relevant times, then, on information and belief, New Castle operated the Excalibur at all relevant times.

6. Defendant TREASURE ISLAND LV, LLC ("**TILV**") is a Nevada limited liability company with its principal place of business in Clark County, NV. On information and belief, TILV—or an unknown predecessor-in-interest for whose acts TILV is liable—operated the Treasure Island Las Vegas casino resort ("the Treasure Island") at all relevant times.

7. Defendant PHILLIP E. RUFFIN ("**Ruffin**") is a natural person residing, on information and belief, in Clark County, NV. On reference, Ruffin is the owner and manager of TILV. On information and belief, Ruffin manages day-to-day operations at the Treasure Island.

//

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

2

8. Defendant PARBALL NEWCO, LLC, ("**Parball**") is a Delaware limited liability company with its principal place of business in Clark County, NV. On information and belief, Parball operated the Bally's Las Vegas ("the Bally's") at all relevant times.

9. Defendant PHW LAS VEGAS, LLC ("**PHW LV**") is a Nevada limited liability company with its principal place of business in Clark County, NV. On information and belief, PHW LV operated the Planet Hollywood Las Vegas ("the Planet Hollywood") at all relevant times.

10. Defendant RIO PROPERTIES, LLC ("**Rio Properties**") is a Nevada limited liability company with its principal place of business in Clark County, NV. On reference, Rio Properties operated the Rio Hotel & Casino Las Vegas ("the Rio") at all relevant times.

11. Defendant LAS VEGAS SANDS CORP. ("**Sands**") is a Nevada corporation with its principal place of business in Clark County, NV. On reference, Sands operated the Venetian Resort Las Vegas casino resort ("the Venetian") at all relevant times.

12. Defendant WYNN LAS VEGAS, LLC ("**Wynn**") is a Nevada limited liability company with its principal place of business in Clark County, NV. On reference, Wynn operated the Wynn Las Vegas casino resort ("the Wynn") at all relevant times.

13. Defendants **MGM**, **MCH**, **New Castle**, **TILV**, **Ruffin**, **Parball**, **PHW LV**, **Rio Properties**, **Sands**, and **Wynn** are referred to collectively herein as the "**Casino Defendants**."

14. Defendant EXTENDED STAY AMERICA, INC. ("**ESA**") is a Delaware corporation with its principal place of business in Mecklenburg County, NC. On reference, at all relevant times ESA was the franchisor that set—and monitored compliance with—the brand standards for the Extended Stay America – SLC Sugarhouse hotel, located at 1220 E. 2100 S., Salt Lake City, UT 84106 (the "Sugarhouse ESA"). On information and belief, at all relevant times ESA was also the corporate parent of ESA Operating and ESA Portfolio, and it controlled their operations for its benefit and without regard for formalities to a degree inconsistent with corporate separateness.

15. Defendant ESA P PORTFOLIO OPERATING LESSEE LLC ("**ESA Operating**") is a North Carolina limited liability company with its principal place of business in Mecklenburg County. On information and belief, ESA Operating ran the Sugarhouse ESA at all relevant times.

**THE702FIRM**
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

3

16.     Defendant ESA P PORTFOLIO L.L.C. ("**ESA Portfolio**") is a North Carolina limited liability company with its principal place of business in Mecklenburg County, NC.  On reference, ESA Portfolio owns the Sugarhouse ESA.  On information and belief, ESA Portfolio owned the Sugarhouse Extended Stay at all relevant times.  On information and belief, if ESA Operating did not operate the Sugarhouse ESA, then ESA Portfolio did so at all relevant times.

17.     Defendant RED LION HOTELS CORPORATION ("**Red Lion**") was a Washington Corporation with its principal place of business in Denver County, CO. On reference, at all relevant times "Red Lion" was the franchisor that set—and monitored compliance with—the brand standards for the – Red Lion hotel, located at 161 W. 600 S., Salt Lake City, UT 84101 (the "SLC Red Lion").

18.     Defendant SONESTA INTERNATIONAL HOTELS CORPORATION ("**Sonesta**") is a Maryland corporation with its principal place of business in Baltimore County, MD.  On information and belief, Red Lion was sold to Sonesta in 2022, and as part of that transaction Sonesta assumed Red Lion's liabilities.

19.     Defendant WHC816, LLC ("**WHC**") is a Delaware limited liability company with its principal place of business in Spokane County, WA, owned—and, on information and belief, operated—the Red Lion hotel located at 161 W. 600 S., Salt Lake City, Utah 84101 (the "SLC Red Lion") until approximately 2015.

20.     Defendant RL SALT LAKE, LLC ("**RL SLC**") is a Delaware limited liability company with its principal place of business in Spokane County, WA, owned—and, on information and belief, operated—the SLC Red Lion from approximately 2015 until the end of the period relevant to this suit.

21.     Defendant CHOICE HOTELS INTERNATIONAL, INC. ("**Choice**") is a Delaware corporation with its principal place of business in Montgomery County, MD. On reference, at all relevant times "Choice Hotels" was the franchisor that set—and monitored compliance with—the brand standards for the Quality Inn hotel, located at 616 S. 200 W., Salt Lake City, UT 84101 (the "Downtown Quality Inn").

//

22. Defendant CRRC PROPERTIES, LLC ("**CRRC**") is a Utah limited liability corporation with its principal place of business in Salt Lake County, UT owned—and on information and belief, operated—the Downtown Quality Inn until approximately 2015.

23. Defendant SALT LAKE LODGING, LLC ("**Salt Lake Lodging**") is a Utah limited liability corporation with its principal place of business in Salt Lake County, UT owned—and, on information and belief, operated—the Downtown Quality Inn from approximately 2015 until the end of the period relevant to this suit.

24. Defendant LA QUINTA FRANCHISING, LLC ("**La Quinta**") is a Nevada limited liability company with its principal place of business in Morris County, NJ.  On reference, at all relevant times "La Quinta" was the franchisor that set—and monitored compliance with—the brand standards for the La Quinta hotel, located at located at 7190 W. Hampden Ave, Lakewood, CO 80227 (the "Lakewood La Quinta").

25. Defendant CPLG PROPERTIES, LLC f/k/a LQ PROPERTIES, LLC f/k/a BRE/LQ, LLC ("**CPLG**") owned—and, on information and belief, operated—the Lakewood La Quinta at all times relevant to this suit.  CPLG is a Delaware limited liability company with its principal place of business in Dallas County, TX.

26. Defendants **ESA Operating**, **ESA Portfolio**, **WHC**, **RL SLC**, **CRCC**, **Salt Lake Lodging**, and **CPLG** are sometimes referred to collectively hereinafter as the "**Hotel Operator Defendants**."

27. Defendants **Red Lion**, **Choice**, and **La Quinta** are sometimes referred to collectively hereinafter as the "**Hotel Franchisor Defendants**."

28. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

//

//

//

//

INTRODUCTION

Pimpology

29.    As far as most people are concerned, sex trafficking is something that only happens to sympathetic women.  In popular depictions of sex trafficking, the victim is nearly always a respectable girl from a good home who has been kidnapped off the street—usually in a foreign country—and who has been forced by to sell her body by means of brutal physical violence.

30.    But as Brian Joseph, formerly an investigative reporter at the Las Vegas Review-Journal explains: "This popular image of sex traffickers and the victims of sex trafficking is almost completely wrong . . .  About the only thing Hollywood gets right is the brutal men, and even that is more complicated."[1]

31.    Most victims of sex trafficking aren't cuddly, and many are not obviously victims. Few trafficking victims cry for help, because few see themselves as needing help.  Most are street savvy and tough as nails.  Many are flaky or personally difficult.  Nearly all have a wealth of past traumas, and it is usually those past traumas that make them vulnerable to exploitation.

32.    The sex traffickers who exploit these women and girls call themselves pimps, but that is a distinction without a difference—the great majority of pimps use threats and physical violence to keep their "stable" of girls hardworking and loyal.[2]

33.    And physical violence is not the pimp's only tool of coercion.  As Ken Ivy, a Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*, pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

> Most hoes have low self-esteem for a reason.  A pimp looks for that weakness, and if it isn't on the surface, he brings that motherfucker out of them. . . .  Weakness is the best trait a person can find in someone they want to control.  You have to tear someone's ego down to nothing before they will start looking to you for salvation.[3]

---

[1] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA XII (forthcoming Oct. 1, 2024).

[2] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm.)

[3] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 22 (2008) ("Law 5: Prey on the Weak").

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

34. However, even non-violent pimps leverage the ever-present threat of other pimps' violence to coerce women they suspect of being independent sex workers—"renegades," in the language of the Life—into "choosing up" and becoming *their* girls.

35. In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control of a naïve sex worker who made the mistake of speaking to him by telling her: "A solo ho without a pimp will soon be under pimp arrest or worse. It's in your best interest to choose a pimp. It's in your best interest to choose Pimpin' Ken."[4]

36. Once a victim is under a pimp's control, standard practice is to take all or nearly all of the money she earns at the end of each night. The pimps spend some of the money to pay for their victims' needs, but only as and when it suits them, creating total dependence on the pimp.[5] Other common control techniques include taking away victims' identification documents, withholding food, and threatening to have CPS separate victims from their children if they disobey.

37. Of course, pimps use incentives too. Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like. Follow-through on even the short-term promises is rare, and retirement is all but unheard of.

38. Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

39. No little girl dreams of becoming a prostitute. Most girls who do become prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion later.[6] Nearly half are still children when they turn their first trick.[7]

40. For most women living it, the life of a pimp-controlled prostitute is a hellish prison from which escape seems not just impossible, but unthinkable. Contrary to the popular image, pimp-controlled prostitution is what sex trafficking looks like in America today.

---

[4] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 79 (2008).

[5] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html; *see also* PIMPOLOGY 20 ("Law 4: Keep a Ho in Arrears . . . To master someone completely, they have to depend on you for everything.")

[6] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).

[7] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, JOURNAL OF TRAUMA PRACTICE, Vol. 2, Issue 3-4 at 40 (2004) (42% of prostitutes in the U.S. started as children).

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

7

41. Fortunately, federal law recognizes this complex reality. The Trafficking Victims Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

42. "Coercion," as used in the statute's definition of human trafficking, includes:

> threats of serious harm to or physical restraint against any person; [or] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person

43. "Serious harm," as used in the statute's definition of coercion, means:

> Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

44. Reading the TVPRA's criminal provision together with its incorporated definitions, human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person *of the same background and in the same circumstances* . . . to continue performing commercial sexual activity."

45. The vast majority of American prostitutes—on reference and belief, at least three-quarters—are victims of human trafficking within the meaning of the TVPRA.

46. Few people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts. After all, the phrase "pimp slap" didn't enter the lexicon because people think pimps are cuddly and supportive.

47. Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture. In other words, most people know prostitutes are often coerced, they just rarely care.

48.    In this case, Marcy spent nearly four years under the control of a single trafficker who beat her constantly, threatened her with guns, threatened to separate her from her children, and insisted on controlling every penny she earned so that she remained totally dependent on him.

49.    Sadly, Marcy's story is far from unique—most prostitutes are subjected to similarly coercive treatment. As will be shown in the next section, casinos and casino workers have long been intimately familiar with the sex industry. They *know* most prostitutes are victims like Marcy.

<u>Sex in Sin City</u>

50.    From Prohibition to the present day, Las Vegas has long had a special reputation for catering to visitors' more disreputable tastes in ways no other city will.

51.    By the 1950s, Las Vegas was famous for catering to male vice, especially in the forms of gambling and prostitution. "Sin City," as Vegas would soon be known, cultivated its image as *the* place for men to get away and enjoy themselves, free from the burdens of their families and the judgment of their communities.

52.    Although prostitution had technically been illegal in Clark County since 1931, easy access to commercial sex remained key part of the city's allure for many male visitors.

53.    This was only possible because Vegas happily tolerated a nominally illegal yet nearly omnipresent commercial sex sector. As late as the mid-1950s, the Clark County Sheriff still tolerated a brothel operating openly just a few miles off the Strip. Even after the last openly acknowledged Clark County brothels closed, commercial sex in Vegas remained a matter of police concern only when its consequences spilled over to people not involved in the industry.

54.    Vegas's casinos openly welcomed, played into, and benefitted from Vegas's sexualized image. For decades, the standard cover motif of *Fabulous Las Vegas*—the City's premier entertainment publication—was a scantily clad woman posing next to a swanky casino.

55.    Worse, Vegas casinos have long invited a discreet and sanitized segment of the city's extensive sex trade onto their gaming floors and into their guest rooms.

56.    As David Schwartz, Director of the Center for Gaming Research at UNLV puts it when discussing the 1950s, Vegas's casinos created a hierarchy of sex work that, "mirrors in many ways the socioeconomic world of the Strip. For high rollers, the select pit girls were available,

much like comped rooms and other luxuries. For less well-connected players, the cocktail lounge prostitutes provided a similar service within the casino resort. Finally, for those who either had little money or whose predilections, violent or otherwise, could not be satisfied by the 'call girls' of the casino, streetwalkers represented the bottom of Las Vegas's prostitution hierarchy."[8]

57.    This system of illegal yet openly tolerated prostitution greatly benefited the casinos because it ensured their male guests could always find the commercial sex that was one of Vegas's main draws, while at the same time it "kept the actual casino operators' involvement with prostitution to a minimum. At the most, casino managers would introduce high rollers to 'clean' prostitutes who would not attempt to rob or blackmail the player."[9]

58.    At the same time, the technical illegality of prostitution meant, "the casino[s] could have a free hand in ejecting 'undesirable' prostitutes from the premises."[10]

59.    Over the subsequent decades, shifting social mores and a push to broaden Vegas's appeal led casinos to demand greater discretion from the sex workers they invite in.

60.    But even today, the hierarchy the casinos pioneered decades ago remains largely intact:   A "clean" prostitute who doesn't make trouble is welcome in any casino on the Strip because they and their employees know cracking down on the trade would put them at a disadvantage versus more "tolerant" competitors.   And casino employees still frequently earn generous kickbacks for connecting guests to sex workers.

61.    More importantly, Vegas casinos continue to actively protect the male sex tourists who flock to their gaming floors and nightclubs.  They do this by enforcing an unwritten rule that the Las Vegas Metropolitan Police Department ("LVMPD") may not arrest "johns" inside casinos.

62.    This is not mere speculation.  Public records show that during the seven years from 2011 through 2017, the LVMPD made 998 arrests inside of Strip casinos that led to charges for either soliciting or engaging in prostitution.  Of the 998 arrestees, 28 (2.8%) were males while 970 (97.2%) were females.

---

[8] SCHWARTZ, DAVID, SUBURBAN XANADU 61 (2013).
[9] Id.
[10] Id.

63.     Worse, of those 28 males who were arrested, only 5 (0.5% of the total) were johns, with the other 23 being themselves prostitutes. In other words, between the beginning of 2011 and the end of 2017, the LVMPD arrested prostitutes and johns at a 200-to-1 ratio inside Strip casinos.

64.     Such a disparity could not possibly have happened by accident. Moreover, we know it didn't happen by accident because Sgt. Donald Hoier (Ret.), former head of the LVMPD Vice unit's Pandering Investigations Team, tells us as much.

65.     According to Sgt. Hoier, everyone in Vice understands the "unwritten rule" that you do not arrest johns inside of casinos because it would be "bad for business."[11]

66.     Sgt. Hoier personally disapproved of this unwritten rule and, on one occasion, he arrested a pair of johns and took them to the casino's security office "as he would a prostitute." Afterward, he reports that he was confronted by the casino's security director, who threatened to "deny resources for future Vice operations (such as hotel rooms for undercover stings)" if it happened again.[12]

67.     The casinos also continue to broadcast obvious hints about the sexual services—and protection from prosecution—available to their guests. Perhaps the best example of this is the world-famous slogan: "What Happens Here, Stays Here" (a/k/a "What Happens in Vegas, Stays in Vegas").

68.     Created in 2003 under the aegis of the casino-dominated Las Vegas Convention and Visitors Authority ("LVCVA"), the slogan is intentionally ambiguous. Its creators' stated goal was to remind viewers that Vegas has more to offer than gambling, while leaving the details to their imaginations. But given Vegas's longstanding reputation, everyone involved must have known it would be interpreted by many as a thinly veiled promise to protect sex tourists.

69.     Certainly, that's how UNLV sociology professor Barb Brents, who studies Nevada's sex industry, interprets it.[13]

---

[11] [11] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA 114 (forthcoming Oct. 1, 2024).
[12] Id.
[13] See Lopez, Sandy, Prostitution in Nevada has its advantages, experts say, LAS VEGAS REVIEW-JOURNAL (July 7, 2016), www.reviewjournal.com/local/local-las-vegas/downtown/prostitution-in-nevada-has-its-advantages-experts-say/.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

11

70.    So, when Vegas's casinos authorized and funded these ambiguous-yet-risqué ads for over 15 years (through 2018), they knew the promise they were making, and they did it anyway.

71.    Today, Nevada retains its status as the "symbolic center of the commercial sex industry."[14]  It is no coincidence that Nevada is also the State with the second-highest rate of human trafficking.[15]  Nor is it a coincidence that the FBI calls Las Vegas one of 13 "High Intensity Child Prostitution Areas."[16]

72.    Because of their long familiarity with the sex trade, the casinos are aware that most of the prostitutes whom they permit their guests to patronize—and permit their employees to assist guests in patronizing—are, in fact, compelled to sell their bodies by force, fraud, or coercion.

73.    But Defendants stand to gain far more than they lose from inviting the sex trade into their properties, so the casinos continue to facilitate human trafficking.  It appears that nothing will change until human trafficking becomes a net-negative for the casinos' bottom lines.

Hospitable to Trafficking

74.    The casino industry is not the only industry whose participants often knowingly profit from sex trafficking.  The same is also true of the hotel industry, inside of whose rooms a majority of sex trafficking nationwide takes place.

75.    One study of trafficking victims found that 80 percent of victims who were trafficked and forced to sell sex had sold sex in a hotel.[17]

76.    Sex trafficking is a problem that could not exist—not on anything like the same scale, at least—absent the willing cooperation of the hospitality industry, in whose rooms the great majority of the victims' suffering occurs.

77.    This action follows.

---

[14] Heineman, Jennifer et al., *Sex Industry and Sex Workers in Nevada*, SOCIAL HEALTH OF NEVADA, 1 (2012), *available at* digitalscholarship.unlv.edu/social_health_nevada_reports/48.

[15] *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state.

[16] *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.

[17] Brittany Anthony et al., *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, POLARIS, 16 (July 2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf

## BACKGROUND

Marcy's Trafficking Begins

78. By 2010, when Marcy was 20 years old, she was a single mother to two young children and was working two jobs to keep her children fed, clothed, and housed.

79. Unfortunately, in about 2012 she started dating a man named Delquan Danford.

80. Soon, Delquan moved in with Marcy and her children in the home she paid for.

81. Sometime in 2012, Delquan lost his job, and Marcy was forced to take on the burden of supporting him as well as her two children.

82. Unsatisfied with the life Marcy could provide for him through legitimate employment, Delquan soon began forcing Marcy to sell her body to make the money he needed to support his habits.

83. Delquan used a variety of coercive methods to force Marcy to engage in commercial sex for his benefit. He beat Marcy regularly when she displeased him. He carried guns and used them to threaten Marcy. He threatened to take Marcy's children from her, or to report her to Child Protective Services ("CPS") so that CPS would take her children.

84. After Marcy gave into his demands and began engaging commercial sex for his benefit, Delquan would post online ads offering Marcy for commercial sex. To keep Marcy obedient, he would sometimes print the ads and threaten to show them to Marcy's family.

85. Delquan also insisted on controlling every penny Marcy earned, forcing her into a state of total dependence on him for even the most basic necessities.

86. Delquan also forced Marcy to have his street name "Greezy" tattooed on her arm where it would be visible to anyone who saw her. "Branding" like this is commonly used by pimps both to advertise and to reinforce their control over their victims.

87. For nearly four years beginning in 2012, Delquan forced Marcy to have sex with as many as ten men per day, almost every day.

88. Delquan primarily forced Marcy to walk the carpets inside casinos on the Las Vegas strip, but sometimes he would fly her to Salt Lake City, Utah or Lakewood, Colorado, near Denver and force her to sell herself from hotel rooms in those locations.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

13

89. When he sent Marcy to other cities, Delquan would often remain behind in Las Vegas, keeping her children with him. Delquan used Marcy's children as a lever to control her, both when they were together in Las Vegas and when he forced her to travel and leave them behind.

90. Delquan would sometimes force Marcy's children to call her and tell her that she was never going to see them again.

91. On one occasion in 2015, Marcy had an unsuccessful night looking for johns in the Rio. Eventually, she gave up and headed home around five o'clock in the morning. When she got there, she found Delquan in her bed with another woman.

92. When Marcy told the other woman to leave, Delquan beat Marcy into unconsciousness. When she regained consciousness, Delquan strangled her to the point that one of his friends staying in the home pulled away him, yelling, "You're going to kill her!"

93. Marcy still suffers the physical and emotional aftereffects of this and other attacks, as well as of being forced to have sex with thousands of strange men during the years she was trafficked.

Marcy's Trafficking in Las Vegas

94. Marcy was primarily trafficked in Las Vegas, Nevada. During the years she was trafficked, she was forced to walk the carpet in most or all of the casinos on the Strip.

95. On the Strip, Marcy would "walk the carpet" and perform "out calls." "Walking the carpet" is analogous to "walking the street" but inside of a casino. An "out call" is when a sex worker travels to the client's location, rather than the client coming to the sex worker.

96. After her nights working on the Vegas strip, Delquan would strip search Marcy when she returned to her house.

97. Most frequently, Marcy was forced to walk the carpet at the Mirage, the Treasure Island, the Bally's, the Planet Hollywood, the Rio, the Excalibur, the Venetian, and the Wynn.

98. Marcy sold sex frequently at each of the Casino Defendants' listed casinos, including on multiple occasions each during late 2014 and early 2015.

99. When walking the carpet and trying to attract customers, Marcy would sit at bars or at slot machines near the elevators leading to guest rooms.

100.    Marcy frequently succeeded in attracting johns at the Casino Defendants' properties.  These johns had no difficulty identifying Marcy as a sex worker based on her attire and the way she loitered at bars or near the elevators.

101.    Longtime casino employees are well known for their ability to identify sex workers. Not only do they witness the patterns of sex worker and customer behavior night after night, they also have a financial incentive to hone their skills because sex workers rarely gamble or tip much, so time spent attending to sex workers is time ill-spent from the employees' perspectives.

102.    Many of the employees in the bars and on the gaming floors of each of the Casino Defendants' properties would have been longtime casino employees.  These employees would have been more experienced in and skilled at identifying sex workers than most of the men who approached Marcy for commercial sex.

103.    It is therefore virtually certain that employees of each of the Casino Defendants identified Marcy as a sex worker on numerous occasions, including several occasions each during late 2014 and 2015.

104.    On at least one occasion each, bartenders at the Planet Hollywood, the Mirage, and the Treasure Island connected Marcy with casino guests who were looking to purchase commercial sex, either by directing the sex-tourist guests to speak to Marcy or by pointing sex-tourist guests out to Marcy.

105.    The bar staff at each of these locations (the Mirage, Treasure Island, and Planet Hollywood) knew that Marcy was selling sex within their establishments, but rather than report her, they aided in her exploitation because they understood that doing so was good for business.

106.    On one occasion, while Marcy was walking the carpet at the Excalibur, a security staff member pulled Marcy into a back room. He then pulled a condom out of his pocket and told her that if she did not have sex with him, he would have her sent to jail.

107.    On another occasion, after Marcy had a financial disagreement with a john at the Treasure Island and left the john's room carrying the john's iPad, the john chased her through the casino and grabbed her by her hair.

//

108.   Although Treasure Island security knew that the john had just purchased commercial sex from Marcy on their property, Treasure Island security profusely apologized to the john and sent him back to his room before handing Marcy over to the LVMPD.

109.   On reference and belief, it is common practice—both at the Treasure Island and at the Casino Defendants' other properties—for security staff to treat prostitutes who make the casinos look bad as criminals even while they treat all johns as honored guests.

### The Casino Defendants' Surveillance

110.   On information and belief, during the time period of Marcy's trafficking, all of the Casino Defendants used sophisticated facial recognition software, with which they monitored their properties' omnipresent security cameras, particularly at casino entrances.

111.   Las Vegas casinos, including those of Defendants, have long been at the cutting edge of surveillance technology.  "With increased competition comes the technocratic race to modernize facilities, generate revenue, and minimize losses.  Thus, it was only a matter of time before casinos employed some of the most elaborate surveillance and security systems in the world."  Gabel, Jessica, *CSI Las Vegas:  Privacy, Policing, and Profiteering in Casino Structured Intelligence*, UNLV GAMING LAW JOURNAL, Vol. 3:39, at 40 (Spring 2012).

112.   One major purpose of this facial recognition software was to assist their security staff in turning away persons the Casino Defendants considered undesirable by flagging such persons wherever they were spotted in the casinos and alerting security personnel.

113.   On information and belief, each Casino Defendant's facial recognition software was able to (and did) recognize and flag Marcy as a likely sex worker.

114.   Even if Marcy was not flagged by the facial recognition software, each Casino Defendant's security staff would have witnessed dozens of instances of Marcy following a guest upstairs to his room, staying in his room for an hour or two, and then heading back downstairs alone.  For each Casino Defendant, several of these instances occurred during late 2014 or 2015.

115.   On information and belief, security personnel at each Casino Defendant's properties became aware on multiple occasions that Marcy was visiting (or had just visited) their casino for the purpose of engaging in commercial sex.

116.    Additionally, because the Casino Defendants' security employees were perforce more familiar with the sex industry than members of the public, they would have been aware that most prostitutes—especially those with visible brands like Marcy—are victims of coercion.

117.    Thus, on information and belief, the employees knew Marcy was being trafficked.

118.    Nevertheless, the employees turned a blind eye to Marcy's plight because to do otherwise would have potentially upset their valued sex-tourist guests.

119.    On information and belief, this willful blindness was intentionally fostered by the Casino Defendants in order to please their clientele and so pad their bottom lines.

120.    Additionally, this willful blindness was likely encouraged by the Casino Defendants' desire to draw a sharp line between "consensual prostitution" and human trafficking that in a way that incorrectly places nearly all prostitutes on the "consensual" side of the line.

121.    On information and belief, to the extent that the Casino Defendants gave their employees any training on recognizing human trafficking, that training strongly emphasized the idea that most prostitution is consensual, and thus that employees should only take action (or report to their superiors) if they witnessed clear direct evidence of severe physical abuse.

<u>The Casino Defendants' Embrace of Sex Trafficking</u>

122.    The Casino Defendants are loyal heirs to a longstanding tradition of Strip casinos welcoming sex tourism to pad their bottom lines, as further described in the Introduction to this Complaint, *supra*.

123.    Las Vegas Metropolitan Police Department ("LVMPD") arrest records and public-facing guest reviews of Defendants' properties both make clear that Defendants knowingly and intentionally encourage sex tourism inside their properties.

124.    We first consider what LVMPD records can tell us.

125.    Prostitution is a crime where it very much "takes two to tango." In theory, then, roughly equal numbers of men and women should be arrested for and charged with soliciting or engaging in prostitution.

126.    Indeed, when one considers that most prostitutes are coerced into sex work, one might reasonably hope that more men than women would be charged with prostitution offenses.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

127.   Sadly, the world is rarely fair to sex workers.  In reality, the LVMPD arrests considerably more women than men for soliciting or engaging in prostitution.

128.   Specifically, during the seven-year period from the beginning of 2011 through the end of 2017, the LVMPD made 1,053 arrests leading to charges for soliciting/engaging in prostitution inside the primary Zip Code for the Las Vegas Strip, namely Zip Code 89109.

129.   Of those 1,053 arrests, 998 were made inside of Strip casinos, and 55 were made somewhere other than inside a Strip casino.

130.   Of the 55 arrests made outside of casinos, 20 of the arrestees were male, and 35 were female.  Thus, **36% of all non-casino arrestees were male, and 64% were female**.

131.   A female-to-male arrest ratio of almost 2:1 seems unfair—indeed, *is* unfair—for a crime that almost always involves one perpetrator of each gender.  But compared to the gender ratio for in-casino prostitution arrests, a gender ratio of 2:1 seems practically utopian.

132.   Of the 998 arrests leading to charges for soliciting/engaging in prostitution made inside Strip casinos from 2011 to 2017, 28 of the arrestees were male, and 970 were female.  Thus, **2.8% of all in-casino arrestees were male, whereas 97.2% were female**.

133.    In other words, during the period when Marcy was trafficked in Defendants' properties, men who solicited prostitutes inside Strip casinos were over ten times less likely to face prosecution than men who solicited prostitutes on the Strip outside of a casino.

134.   Moreover, all but five of the men arrested inside strip casinos were themselves prostitutes, so **the prostitute-to-john ratio among arrestees was 993-to-5, or nearly 200-to-1**.

135.   This did not happen—and could not have happened—by accident.  Instead, it is almost certainly the result of two factors, both of which are fully under the control of the casinos themselves:

    a.    Although casinos regularly report undesirable sex workers and trafficking victims to the LVMPD and assist in their arrests, the same casinos never—or at least very, very rarely—do the same for the many male guests whom they witness soliciting commercial sex; and

    b.    Casinos discourage the LVMPD officers from arresting male guests on their own initiative using persuasion, cajolery, and threats (whether explicitly or implicitly) to withhold cooperation with LVMPD stings.

136.    In this way, Las Vegas casinos intentionally create an environment where the legal penalties for sex tourism apply exclusively or almost exclusively to the women victimized by it.

137.    They do this for the same reason they created "What happens here, stays here"—because they understand that the prospect of consequence-free sex tourism is one of Las Vegas's major draws, particularly for the casinos' prime demographic of older, wealthier men.

138.    This is not merely an inference based on public records.  According to Sgt. Donald Hoier (Ret.), who was the head of the LVMPD Vice division's Pandering Investigations Team during much of the time Marcy was trafficked, it was common knowledge among Vice officers that johns were not to be arrested on casino property.

139.    Moreover, according to Sgt. Hoier, on the one occasion that he arrested johns inside of a casino, he was told by the casino's head of security that if he did so again, the casino would withhold cooperation with future Vice efforts.

140.    The Mirage, the Treasure Island, the Bally's, the Planet Hollywood, the Excalibur, the Venetian, and the Wynn are all located within Zip Code 89109 such that they are covered by the same public records data described above.  The Rio is in Zip Code 89103, and it is thus covered by data obtained via a separate, subsequent public records request.

141.    Between the start of 2011 and the end of 2017, the sex breakdown for arrests for soliciting/engaging in prostitution inside of the Casino Defendants' properties was as follows:

| Casino | Total Arrestees | Male Arrestees | Female Arrestees | Percent Male Arrestees |
|---|---|---|---|---|
| The Bally's | 1 | 1 | 0 | 100% |
| The Excalibur | 2 | 0 | 2 | 0% |
| The Mirage | 65 | 0 | 65 | 0% |
| The Planet Hollywood | 150 | 5 | 145 | 3.33% |
| The Rio | 18 | 2 | 16 | 11.11% |
| The Treasure Island | 17 | 0 | 17 | 0% |
| The Venetian | 83 | 0 | 83 | 0% |
| The Wynn | 53 | 2 | 51 | 3.77% |

142.    In other words, during the time when Marcy was trafficked inside their properties, the Excalibur, the Mirage, the Treasure Island, and the Venetian provided even more protection from prosecution to their sex-tourist guests than did the average Strip casino.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

19

143. Similarly, the Planet Hollywood, the Rio, and the Wynn all provided similar degrees of protection to their sex-tourist guests as compared to the average Strip casino.

144. Meanwhile, the Bally's stands because it was the location of only a single arrest leading to charges for soliciting/engaging in prostitution during the entire seven-year period, which implies that the Bally's had an unusually high tolerance for sex work even for a Las Vegas casino.

145. We now turn to the story told by public-facing guest reviews of Defendants' properties found on Tripadvisor.

146. Relevant reviews of the Bally's include:

a. One guest awarded one out of five stars, explaining that he was "Propositioned by prostitutes twice IN THE HALLWAY around 7:00 AM." He further explained that he had "[n]otified security in person. Prostitute was later sleeping on the brown sofa outside of the elevator; obviously, security did nothing. If you stay on the 25th floor and want to sit on the sofa, consider sanitizing it first."

b. Another guest awarded two out of five stars in a review entitled "Prostitutes Galore," saying, "I don't believe in taking kids to Vegas but if you do please do not bring them to Bally's because of the prostitutes. I don't mean just one or two, I mean we counted at least 6 differnet girls that we saw. Bring platform shoes, short dresses, usually sat by themselves until they would see a man by themselves. I saw this happen many times. Shame on Bally's for allowing this to go on."

c. Another guest awarded three out of five stars and noted the presence of "'in your face' prostitutes," which he said were, "fun to watch, but my goodness, clean it up a little."

d. Another guest awarded three out of five stars and said, "After 2AM, make a b-line to your room; to avoid the drunks and prostitutes."

e. Another guest awarded five stars and said, "I was propositioned by a woman in the casino, with the standard, 'Are you here for a conference?' line. Watch out for the women with the small purses and who drink coffee in the middle of the night. Those are definite tip-offs that you are dealing with a 'professional'. FYI, prostitution is ILLEGAL in Clark County. Fair warning."

147. All of the Bally's reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016. In total, at least sixteen currently-available Tripadvisor reviews of the Bally's reference the high prevalence of sex work on the property.

//

//

148. Relevant reviews of the Excalibur include:

a. One guest awarded one out of five stars in a review entitled "Stay Away." According to the guest, "This hotel is filled with Prostitutes," and "Non hotel guests have access to elevators and can easily access hotel rooms."

b. Another guest awarded three out of five stars and described seeing "a hand full of prostitutes open[ly] discussing [the] cost of their services" in the casino.

c. Another guest awarded three out of five stars and stated that "the amount of prostitutes working the game floor was shocking."

d. Another guest awarded one out of five stars and stated, "I have never seen so many hookers in a casino.

149. Although all of the Excalibur reviews quoted above were left after Marcy's trafficking ended, it is highly likely that similar reviews were available on various online platforms prior to and during Marcy's trafficking, and that those reviews have simply been scrubbed from review sites or have otherwise become unavailable during the intervening decade.

150. Since 2017 (the date of the earliest such review still available online), nearly two dozen Tripadvisor reviewers have mentioned the prevalence of prostitution at the Excalibur.

151. On information and belief, before they were scrubbed from the internet, the reviews of the Tropicana included numerous similar testimonials about the high prevalence of prostitution and the Tropicana's tolerance thereof.

152. Relevant reviews of the Mirage include:

a. One guest awarded three out of five stars, complaining that "we were very surprised to see . . . a GROUP of prostitutes (they looked the part, but more importantly, the employees verified this and complained about their presence) were there for an extended amount of time on a TUESDAY night."

b. Another guest awarded four out of five stars and advised, "Two nightclubs downstairs if you like to party, just be prepared you will be approached by hookers."

c. Another guest awarded five stars and called the Mirage the "best place I ever stayed in," before explaining that he had "spent too much money . . . even bought art work and three hookers too."

d. Another guest awarded three out of five stars, saying, "things change at night and the Mirage became a different place. . . . At 1:30 AM there were prostitutes everywhere on the casino floor hitting on me. A bit disturbing."

e.   Another guest awarded five stars but complained, "Only one negative, I was hit on by a teenage hooker.  I won't say it was a problem, but I did feel uncomfortable.  I guess that's just Vegas."

153.   All of the Mirage reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016.  In total, at least sixteen currently-available Tripadvisor reviews of the Mirage reference the high prevalence of sex work on the property.

154.   Relevant reviews of the Planet Hollywood include:

a.   One guest awarded two out of five stars, stating, "The nightclub is full of prostitutes that look like they may be teenagers….we thought it was tasteless for an upscale nightclub to allow this sort of thing."

b.   Another guest awarded one out of five stars, complaining, "There $.02 prostitutes roaming free all over the casino floor without reservation attempting to get a date."

c.   Another guest awarded five stars but stated, "The only complaint I have is the hookers.  I was approached three times, once by the rest rooms, once by the elevators, and once while playing a machine."

d.   Another guest awarded one out of five stars, stating, "The casino was absolutely PACKED with HOOKERS . . . PH was the absolute low point of my trip. PH is a money sucking black hole full of hookers."

e.   Another guest awarded four out of five stars in a review titled simply, "HOOKERS."  He explained, "This place is crawling with hookers/escorts. Plan on running from them if you play machines."

155.   All of the Planet Hollywood reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016.  In total, at least forty currently-available Tripadvisor reviews of the Planet Hollywood reference the high prevalence of sex work on the property.

156.   Relevant reviews of the Rio include:

a.   One guest awarded three out of five stars in a review entitled, "Rio is a fight between good and evil."  In the "Good" section of the review, he wrote, "There were several blatant hookers actively looking to pick up Johns."

b.   Another guest awarded one out of five stars and wrote, "there were hookers waiting by the elevators at night propositioning the men as they went to their rooms . . .  Security was very lax."

c.   Another guest awarded five stars but said, "I've never seen so many 'working ladies'; flagrantly strutting their stuff in the open . . . you can tell these ladies were amateurs.  Don't know if there is a hooker school anywhere but these ladies should attend. If I was a cop I could have arrested 5 women the first night. No discretion whatsoever."

d.   Another guest awarded three out of five stars in a review entitled, "Some rumors are true but rooms are nice." In it, he explained, "The main thing I

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

had heard about Rio is that it's full of hookers. Yes, quite a few do come out at night but nowadays you find a lot of that in several of the hotels. We overheard security telling someone that had complained about them that every night they get detained and then they just pay a fee and come right back."

    e.    Another guest awarded three out of five stars, explaining, "What was once a fun energetic upbeat place to hang out has turned into a dated, boring hangout for prostitutes trolling the bars."

157.    All of the Rio reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016. In total, at least eighteen currently-available Tripadvisor reviews of the Rio reference the high prevalence of sex work on the property.

158.    Relevant reviews of the Treasure Island include:

    a.    One guest awarded three out of five stars, saying, "I'm not a huge fan of Vegas in general as I think it has gone way overboard with selling sex. In the past, TI was one of the few places on the strip where I would not be overwhelmed with it. However, while attending a SHOTShow this year, that was no longer the case. There were prostitutes in the casino and in the bars everywhere and security didn't seem to care."

    b.    Another guest awarded three out of five stars and explained, "My biggest beef with the property, however, has nothing to with the rooms, but with the lax security and management that allows the casino floor to be over run with prostitutes and pimps once the sun goes down."

    c.    Another guest awarded three out of five stars in a review entitled, "Great for prostitutes." The guest listed his pros and cons for the casino, and among the "pros" was the statement, "Tons of prostitutes. If you love prostitutes, this is the place for you."

    d.    Another guest awarded one out of five stars and complained, "too many low life prostitutes through out hotel can't walk from elevator to bar without having several very young girls try to hook you for their trick."

    e.    Another guest awarded three out of five stars, saying her "biggest gripe" was that there was "no security anywhere and ALOT of prostitution (though I know it's legal there)."

159.    All of the Treasure Island reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016. In total, at least sixteen currently-available Tripadvisor reviews of the Treasure Island reference the high prevalence of sex work on the property.

160.    Relevant reviews of the Venetian include:

    a.    One guest awarded five stars, saying "[t]he only draw back to my stay was seeing hookers coming up the elevator with us…but I guess what they say is true…What happens in Vegas STAYS in Vegas!"

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

b. Another guest awarded three out of five stars because "[t]his place is infested with prostitutes from late at night to early in the morning. They're in the casino among the slots and the bar. They're in the parking garage with their drivers. They're on the sidewalk and plaza. Everywhere."

c. Another guest awarded four out of five stars, having deducted a star because "[m]y husband has been propositioned by prostitutes the last 2 times we have stayed at the Venetian . . . these pros were very easy to spot and kept going up man to man throughout the casino. I wish security would address this issue. It is quite obvious."

d. Another guest awarded four out of five stars but explained, "[t]his is a 5 star resort and prostitutes were plentiful at the casino. Security seemed to tolerate them. I was accosted to many times to count while sitting at the slot machines. I'm open minded, but it was excessive."

e. Another guest awarded five stars, saying "While I was walking through the hotel . . . I received as many as 5-7 prostitutes hitting on me. So as a joke when went up to the room we called the front desk and asked if they could send up some hookers. They were more than happy to help us. We said no thank you and hung up laughing." The Venetian's Hotel Manager – Guest Relations responded to this review with an apology for the unwanted propositions, but he neither apologized for nor attempted to investigate the front desk personnel who offered to "send up some hookers."

161. All of the Venetian reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016. In total, at least twelve currently-available Tripadvisor reviews of the Venetian reference the high prevalence of sex work on the property.

162. Relevant reviews of the Wynn include:

a. One guest awarded three out of five stars, stating, "we found in the elevator lobbies, drunk people, prostitutes bargaining with customers and so on."

b. Another guest awarded five out of five stars in a review titled "Wynn Win Situation," in which she described the casino as "crawling with hookers" and complained that when she complained to security about her husband being propositioned, security "just laughed it off." She concluded, "I know this is something that maybe lots of men look for so it's just another service provided but there should be another way of doing it that's not so obvious or crude."

c. Another guest awarded four out of five stars in a review titled "Hookers Welcome Here," where they complained of "hookers fighting in the halls."

d. Another guest awarded two out of five stars and said, "the strip is now loaded with prostitutes day in and day out. I am not a prude, but come on Wynn, get them out of the casino!!!" She continued, "in the morning security guards were questioning 'hookers' who had just finished servicing some clients . . . Why don't they stop them from going up the elevators before they service their clients or get them to turn over their clients names…...then band [sic] them from the hotel."

e.   Another guest awarded three out of five stars and said, "I must share that you can easily identify the 'escorts' after nightfall, but we had fun picking them out of the crowd."

163.   All of the Wynn reviews quoted above were left before or during Marcy's trafficking from 2012 through 2016.  In total, over forty currently-available Tripadvisor reviews of the Wynn reference the high prevalence of sex work on the property.

In(n) Calls: Marcy's Trafficking in Salt Lake City & Lakewood

164.   In addition to forcing Marcy to walk the carpet, Delquan periodically sent Marcy to Utah and Colorado to do "in calls" in hotels.  An "in call" is when a customer comes to a sex worker's location—usually a hotel room—for commercial sex.

165.   To do this, Delquan would purchase plane tickets for Marcy and send her to another state while keeping her children in Las Vegas.

166.   Marcy stayed at and was sold for sex in the SLC Red Lion, the Sugarhouse ESA, and the downtown Quality Inn in Salt Lake City, Utah on numerous occasions in 2014 and 2015.

167.   On her first trip to Salt Lake City, Delquan stayed with Marcy at the Quality Inn for several days.  Additionally, Marcy stayed at the Quality Inn and was sold for sex there on about three later occasions.  In total, she spent approximately one to two weeks living in and being sold for sex out of the Quality Inn.

168.   On a later trip to Salt Lake City, Delquan forced her to stay in, and sell sex out of, the Sugarhouse ESA for three weeks straight, encompassing Christmas and New Year's.  This was by far the most common location where Marcy was trafficked in Salt Lake City, and in total she lived in and was sold for sex out of the Sugarhouse ESA for about four months in 2014 and 2015.

169.   On other later trips to Salt Lake City, Delquan forced her to stay in, and sell sex out of, the SLC Red Lion.  In total, Marcy spent at least a month living in and being sold for sex out of the SLC Red Lion.

170.   In Lakewood, Colorado, Marcy stayed at and was sold for sex out of the Lakewood La Quinta on between three and seven occasions during 2015 and 2016.

//

//

171. Marcy had a routine for how she operated while working for Delquan in Salt Lake City, Utah and Lakewood, Colorado. On each occasion when she stayed at one of the above-mentioned locations in those cities, she would:

    a. rent rooms under her real name, using her real identification;

    b. pay rent day-to-day or a few days at time throughout the stay;

    c. frequently request rooms in the back of the properties;

    d. request fresh linens from hotel staff each day;

    e. dispose of the used condoms in the hotel trash cans and toilets (wrappers always went in the trash); and

    f. on occasions when Delquan did not post ads from his base in Las Vegas, post ads on websites known for facilitating commercial sex using the hotel's wifi.

172. At each of these locations, Marcy would average between five and ten "in calls" per day. There was therefore a regular flow of men who were not guests of the hotels going in and out of Marcy's room every day she was at these hotels.

173. Marcy usually met johns in the hotel lobby or by the elevators to ensure they got in, make them feel secure, and to walk them up to her room. Each time she did this, she was obviously dressed for sex work.

174. At hotels with exterior room doors, Marcy would wait for johns in her room. However, the Sugarhouse ESA, the SLC Red Lion, the Downtown Quality Inn, and the Lakewood La Quinta all have interior lobbies, so the front desk employees at all four hotels watched on numerous occasions as Marcy met johns to lead them up to her room. They would also have watched those johns come back down an hour or two later without her, after which the pattern would usually repeat several more times.

175. During these out-of-state stays, Marcy would transfer her earnings to Delquan every day via Walmart-to-Walmart payments. Eventually, apparently tired of the $9.50 service charge with each transaction, Delquan began making Marcy deposit the money directly into his bank account.

176. On one occasion in the Lakewood La Quinta, Marcy opened a condom for the customer, only to turn around and find a gun pointed at her head. The customer, once Marcy convinced him that he was on camera and her pimp was in the room across the hall returned her belongings and fled.

177. This incident occurred just two weeks after Marcy narrowly avoided being raped on an out call.

178. The Lakewood incident was Marcy's breaking point. After the perpetrator fled her room, Marcy had a breakdown and recognized that her death would be imminent—and her children would no longer have a mother—if she didn't get out somehow. Marcy contacted her mother and ran to stay with her, bringing only the clothes on her back. She never got her belongings back, let alone any of the money Delquan took from her.

179. Marcy was successful in her escape from Delquan. Her emotional trauma remains.

The Hotel Franchisor Defendants' Control over and Knowledge of their Franchisees' Conduct

180. It is a standard practice in the hospitality industry—and followed by Red Lion, Choice, and La Quinta—for major hotel brands to set exacting brand quality standards reaching everything from the temperature of all coffee served, to the number of pillows on each bed, to where and how to greet guests.

181. Each Hotel Franchisor Defendant provides its franchisees with signage on and in front of the building that is intended to reassure customers that, if they check into the hotel, they can expect an experience consistent with the standards of the franchisor's brand. The same branding is emblazoned on everything in the hotel, from the pens on the bedside table to the staff's uniforms.

182. It is standard practice in the hospitality industry for hotel franchisors to require franchisees to obtain prior approval from their franchisors before hiring managers. Franchisors are generally free to withhold their approval for any reason, and they have the authority to require franchisees to hire hotel management companies preapproved by them. On information and belief, Red Lion, Choice, and La Quinta each incorporated this standard practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

183.    It is standard practice in the hospitality industry for hotel franchisors to require their franchisees to use their proprietary computerized business systems, which systems usually:

    a.    Share the franchisee's reservation data with the franchisor;

    b.    Give the franchisee access to the franchisor's central reservation service;

    c.    House the franchisee's property information and streamline its property management tasks;

    d.    House and handle the franchisee's revenue and expenditure management, including payment processing;

    e.    House and handle the franchisee's rate and inventory management;

    f.    House the franchisee's employee training records and connect the franchisee to franchisor-created and/or franchisor-approved training modules for its employees on a franchisor-determined schedule; and

    g.    Otherwise house nearly all data and decisionmaking related to the day-to-day operation of franchisee hotels.

184.    On information and belief, each relevant franchise agreement between Red Lion, Choice, or La Quinta and a franchisee Hotel Operator Defendant required the franchisee to use the franchisor's proprietary computerized business system.

185.    It is standard practice within the hospitality industry for hotel franchisors to require their franchisees to give them complete and unfettered remote access to all information stored in their proprietary computerized business systems.  Thus, on information and belief, anytime a Hotel Operator Defendant's employee input an electronic note or took any action that affected the hotel's inventory, reservations, revenue, or personnel, the relevant franchisor knew about it.

186.    It is standard practice within the hospitality industry for hotel franchisors to require their franchisees to use specific revenue optimization software to guide them in pricing their rooms and setting compensation for their employees.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this standard practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

187.    It is standard practice within the hospitality industry for hotel franchisors to require their franchisees to use the franchisor's preferred vendor to set up and maintain wifi for

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

hotel guests.  Thus, the franchisor typically controls whether guests may access certain sites, and the franchisor—rather than the franchisee—has access to guests' browsing histories.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this standard practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

188.    It is standard practice within the hospitality industry to require franchisees to purchase training for their employees from the franchisor.  Such training is often required for all new employees.  For management and other senior employees, franchisor-mandated trainings generally cover all aspects of running a hotel that lives up to the franchisor's brand standards.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this standard practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

189.    By mandating particular trainings for particular job titles, franchisors effectively mandate that franchisees employ a standardized set of job titles and job responsibilities for their employees.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this standard practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

190.    Generally, all employees who take part in the franchisor-mandated trainings must complete them to the franchisor's satisfaction.  Because franchisors generally require all franchisee employees to complete at least one training within two weeks after being hired, franchisors generally have an absolute veto over all franchisee employee hires.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this general practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

191.    On information and belief, Red Lion, Choice, and La Quinta each provided their franchisees, including the Hotel Operator Defendants, with sample employment agreements and lists of job responsibilities, giving them effective control over most aspects of their franchisees' employees' employment.

//

192.    During the relevant period, Red Lion, Choice, and La Quinta retained the absolute right to inspect franchisee hotels at any time, and they each had the ability to levy fines or fees for failure to meet brand standards—which standards they had the power to modify.

193.    During the relevant period, Red Lion, Choice, and La Quinta prevented their franchisees from maintaining their own websites, and they each required that all online bookings be handled through the franchisor's own central booking system.

194.    It is a standard practice in the hospitality industry for franchisors to expressly retain the right to detect criminal activity using the data supplied by its control over franchisees' computer systems, as well as the right to turn over any evidence of criminal activity to law enforcement.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this general practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

195.    It is a standard practice in the hospitality industry for franchisors to monitor all guest reviews and complaints on online platforms, and for franchisors to charge franchisees a fee if they fail to respond promptly to a negative review.  On information and belief, Red Lion, Choice, and La Quinta each incorporated this general practice into their operative franchise agreements with the Hotel Operator Defendants covering the relevant period.

196.    Choice, and La Quinta each knew, throughout the relevant period, that their franchise locations played host to at least thousands and likely many tens of thousands of instances of sex trafficking each year.  Red Lion knew, throughout the relevant period, that its franchise locations played host to hundreds and likely thousands of instances of sex trafficking each year.

197.    Additionally, in a parallel with the Casino Defendants' properties, there are several public-facing reviews of the Downtown Quality Inn—operated by Defendants CRCC and Salt Lake Lodging and franchised by Defendant Choice—which mention the prevalence of prostitution on the property, including the following:

> a.    One guest awarded one out of five stars, stating "the hotel was dirty and I am certain that at least twice I encountered prostitutes in the hallways or parking lot."

b.  Another guest awarded two out of five stars, stating, "I wasn't expecting hourly hookers to be roaming around."

c.  Another guest awarded two out of five stars, stating, "Unsafe and horrible experience Homeless hangout and prostitution everywhere."

d.  Another guest awarded one out of five stars because of the, "Possible prostitution ring being operated here. Very seedy characters going in and out from the front parking lot to a room. Also a young girl in revealing clothing hanging out in front going in and out of the 'hotel' with other sketchy people. . . . Stains on the box spring of the mattress, also found a 'male enhancement package' under the mattress. (As if the prostitution wasn't already obvious)  They might as well put "Brothel" on the sign or maybe Name it the "we have no quality inn. . . . Do yourself a favor and spend the extra $100 and stay in an actual hotel, not this dump it is a haven for criminal activity posing as a legitimate business.

198.  Although only the first of the above-quoted reviews was left during Marcy's trafficking, it is likely that other, earlier reviews also mentioned the prevalence of prostitution at the Downtown Quality Inn, and that those reviews have been removed or become inaccessible.

199.  At least five currently-available public facing reviews of the Downtown Quality Inn mention the prevalence of sex work on the property.

### COUNT I: 18 U.S.C. § 1595 ("TVPRA")

200.  Plaintiff incorporates each foregoing and subsequent allegation.

201.  Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

202.  Through their acts and omissions described above, the Casino Defendants, the Hotel Operator Defendants, and the Hotel Franchisor Defendants are each "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a), and they are thus liable under 18 U.S.C. § 1595.

203.  Through their acts and omissions described above, the Casino Defendants, the Hotel Operator Defendants, and the Hotel Franchisor Defendants each benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that they knew or should have known earned money from sex trafficking, and they are thus liable under 18 U.S.C. § 1595.

204.  Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

205.   Defendant ESA is liable as the alter ego of ESA Operating and ESA Portfolio.

206.   Defendant Sonesta is liable because it assumed the liabilities of Red Lion.

### COUNT II: C.R.S. 13-21-127

207.   Plaintiff incorporates each foregoing and subsequent allegation.

208.   Plaintiff is a victim of human trafficking for sexual servitude in the meaning of C.R.S. 18-3-504(1)(a).

209.   Through their actions described above, La Quinta and CPLG proximately caused Plaintiff's trafficking within the meaning of C.R.S. 18-3-504(1)(a).

210.   Through their actions described above, La Quinta and CPLG caused damages to the Plaintiff, as described in C.R.S. 13-21-127(1).

211.   Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being sex trafficked, and she is therefore entitled to bring an action against La Quinta and CPLG for damages under C.R.S. 13-21-127.

### COUNT III: UTAH CODE 77-38-15 (NOW UTAH CODE 78B-3-113)

212.   Plaintiff incorporates each foregoing and subsequent allegation.

213.   Plaintiff is a victim of a person that committed human trafficking within the meaning of Utah Code 77-38-15 (subsequently renumbered to Utah Code 78B-3-113).

214.   Through their actions described above, Defendants ESA Operating, ESA Portfolio, WHC, RL SLC, CRCC, Salt Lake Lodging, Red Lion, and Choice committed human trafficking for sexual exploitation within the meaning of Utah Code 76-5-308.1.

215.   Plaintiff is therefore entitled to bring an action against the listed Defendants under Utah Code 77-38-15.

216.   Defendant ESA is liable as the alter ego of ESA Operating and ESA Portfolio.

217.   Defendant Sonesta is liable because it assumed the liabilities of Red Lion.

### COUNT IV : NEGLIGENCE OR PREMISES LIABILITY

218.   Plaintiff incorporates herein each foregoing and subsequent allegation.

219.   The Defendants owed Plaintiff a duty of reasonable care under the circumstances.

//

220.    As described above, the Casino Defendants, the Hotel Operating Defendants, and the Hotel Franchisor Defendants negligently caused, or allowed to arise, unsafe conditions including, *inter alia*, by allowing Plaintiff to be sex trafficked in their establishments.

221.    Defendants La Quinta and CPLG failed to exercise reasonable care on their premises and are subject to liability under C.R.S. 13-21-115.

## COUNT V : INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

222.    Plaintiff incorporates each foregoing and subsequent allegation.

223.    Defendants' intentional acts and omissions, as described above, were extreme and outrageous to the point of being intolerable in a civilized society.

224.    Plaintiff suffered severe emotional distress and permanent psychological injuries as a result of Defendants' intentional acts and omissions, and she is therefore entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.    Disgorgement of profits and/or restitution;

c.    Punitive damages, attorneys' fees, and expenses;

d.    The costs of this action;

e.    Pre- and post-judgment interest; and

f.    Any other relief the Court or jury deems appropriate.

DATED this 3rd day of October, 2024.

THE702FIRM
/S/ MICHAEL KANE

_____
MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

33

JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
400 South 7th Street, Suite 400
Las Vegas, Nevada  89101

*Attorneys for Plaintiff Marcy C.*

## DEMAND FOR JURY TRIAL

Plaintiff Marcy C., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 3rd day of October, 2024.

**THE702FIRM**
**/S/ MICHAEL KANE**

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
400 South 7th Street, Suite 400
Las Vegas, Nevada  89101

*Attorneys for Plaintiff Marcy C.*

Electronically Filed
10/28/2024 9:06 PM
Steven D. Grierson
CLERK OF THE COURT

**NOTA**

Matthew D. Spring, Esq
Nevada Bar No. 11721
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com

*Attorneys for Defendant, Salt Lake Lodging, LLC*

## IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE

## OF NEVADA IN AND FOR THE COUNTY OF CLARK

\*\*\*\*\*\*\*\*\*

MARCY C., pseudonymously,

  Plaintiff,

  v.

MGM RESORTS INTERNATIONAL;
THE MIRAGE CASINO-HOTEL, LLC;
NEW CASTLE, LLC; TREASURE
ISLAND LV, LLC; PHILLIP E.
RUFFIN; CAESAR'S
ENTERTAINMENT, INC.; DESERT
PALACE, LLC; PARBALL NEWCO,
LLC; PHW LAS VEGAS, LLC; PHW
MANAGER, LLC; RIO PROPERTIES,
LLC; LAS VEGAS SANDS CORP.;
WYNN LAS VEGAS, LLC;
EXTENDED STAY AMERICA, INC;
ESA P PORTFOLIO L.L.C.; ESA P
PORTFOLIO OPERATING LESSEE
LLC; RED LION HOTELS
CORPORATION; SONESTA
INTERNATIONAL HOTELS
CORPORATION; WHC816, LLC; RL
SALT LAKE, LLC; CHOICE HOTELS
INTERNATIONAL, INC.; SALT LAKE
LODGING; CRRC PROPERTIES, LLC;
LA QUINTA FRANCHISING, LLC;
CPLG PROPERTIES, LLC,

  Defendants.

Case No.: A-24-903147-C
Dept.:     14

**NOTICE OF APPEARANCE OF COUNSEL**

– 1 –

Matthew D. Spring, Satesh Sam Patel and the law firm of Clarkson & Associates, LLC, enter their appearance on behalf of Defendant, Salt Lake Lodging, LLC.

DATED 28th day of October, 2024.

CLARKSON & ASSOCIATES, LLC

_/s/Satesh Sam Patel_____
Matthew D. Spring, Esq.
Nevada Bar No. 1172
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com
*Attorneys for Defendant, Salt Lake Lodging, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of October, 2024, a true and correct copy of the foregoing **NOTICE OF APPEARANCE OF COUNSEL** was submitted electronically for filing and e-service with the Eighth Judicial District Court and electronic service on all registered users receiving service under NEFCR 9(b), via Eighth Judicial District Court's Electronic Filing and Service System.

CLARKSON & ASSOCIATES, LLC

 /s/ Satesh Sam Patel
Satesh Sam Patel

– 3 –

Electronically Filed
10/28/2024 9:06 PM
Steven D. Grierson
CLERK OF THE COURT

**MDSM**
Matthew D. Spring, Esq
Nevada Bar No. 11721
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com

*Attorneys for Defendant, Salt Lake Lodging, LLC*

# IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE

## OF NEVADA IN AND FOR THE COUNTY OF CLARK

**\*\*\*\*\*\*\*\*\***

MARCY C., pseudonymously,

        Plaintiff,

    v.

MGM RESORTS INTERNATIONAL;
THE MIRAGE CASINO-HOTEL, LLC;
NEW CASTLE, LLC; TREASURE
ISLAND LV, LLC; PHILLIP E.
RUFFIN; CAESAR'S
ENTERTAINMENT, INC.; DESERT
PALACE, LLC; PARBALL NEWCO,
LLC; PHW LAS VEGAS, LLC; PHW
MANAGER, LLC; RIO PROPERTIES,
LLC; LAS VEGAS SANDS CORP.;
WYNN LAS VEGAS, LLC;
EXTENDED STAY AMERICA, INC;
ESA P PORTFOLIO L.L.C.; ESA P
PORTFOLIO OPERATING LESSEE
LLC; RED LION HOTELS
CORPORATION; SONESTA
INTERNATIONAL HOTELS
CORPORATION; WHC816, LLC; RL
SALT LAKE, LLC; CHOICE HOTELS
INTERNATIONAL, INC.; SALT LAKE
LODGING; CRRC PROPERTIES, LLC;
LA QUINTA FRANCHISING, LLC;
CPLG PROPERTIES, LLC,

        Defendants.

Case No.: A-24-903147-C
Dept.:    14

**HEARING REQUESTED**

**DEFENDANT, SALT LAKE
LODGING, LLC'S MOTION TO
DISMISS FOR LACK OF
PERSONAL JURISDICTION
AND SUPPORTING
MEMORANDUM**

– 1 –

Defendant, Salt Lake Lodging, LLC, a Utah limited liability company ("Salt Lake Lodging") right to dismissal is straightforward. Salt Lake Lodging has no significant contacts, ties, or relations with the State of Nevada. The exercise of jurisdiction over Defendant would violate due process as Defendant has neither purposefully availed itself of the privilege of conducting activities within Nevada nor established minimum contacts with the forum state. Therefore, Defendant respectfully requests that this action be dismissed for lack of personal jurisdiction.

Pursuant to Nevada Rules of Civil Procedure Rule 12(b)(2), and the Court's inherent authority, Salt Lake Lodging, by and through counsel of the law firm of Clarkson & Associates, LLC, hereby respectfully requests this Court to dismiss Salt Lake Lodging as a defendant in this case.

This Motion is supported by the following Memorandum of Points and Authorities, on pleadings and papers on file in this action, and any such arguments as the Court may allow.

DATED 28th day of October, 2024.

CLARKSON & ASSOCIATES, LLC

/s/Satesh Sam Patel
Matthew D. Spring, Esq.
Nevada Bar No. 1172
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com
*Attorneys for Defendant, Salt Lake Lodging, LLC*

– 2 –

**NOTICE OF MOTION**

TO: ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that the undersigned will bring the foregoing Motion to Dismiss for Lack of Personal Jurisdiction on for hearing before the above-entitled Court, on a date and time to be set by the Court, or as soon thereafter as counsel may be heard.

DATED 28th day of October, 2024.

CLARKSON & ASSOCIATES, LLC

 /s/Satesh Sam Patel
Matthew D. Spring, Esq.
Nevada Bar No. 1172
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com
*Attorneys for Defendant, Salt Lake Lodging, LLC*

– 3 –

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION:**

    **a.** Plaintiff's Complaint seeks to invoke the jurisdiction of this Court over Defendant, Salt Lake Lodging, LLC, a Utah limited liability company with no significant contacts, ties, or relations with the State of Nevada. The exercise of jurisdiction over Defendant would violate due process, as Defendant has neither purposefully availed itself of the privilege of conducting activities within Nevada nor established minimum contacts with the forum state. Therefore, Defendant respectfully requests that this action be dismissed for lack of personal jurisdiction.

**II.    LEGAL ARGUMENT:**

    **a. Legal Standard:**

        **i.** Under Nevada law, the Court may exercise personal jurisdiction over a non-resident defendant only if such jurisdiction complies with the Due Process Clause of the United States Constitution.[1] The Due Process Clause requires that the defendant have "minimum contacts" with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."[2]

        **ii.** The Plaintiff bears the burden of demonstrating that the Court has personal jurisdiction over the Defendant.[3] To establish specific jurisdiction, the Plaintiff must show that (1) the defendant purposefully directed its activities toward the forum state; (2) the claim arises out of or relates to the defendant's forum-related

---

[1] "A court of this state may exercise jurisdiction over a party to a civil action on any basis not inconsistent with the Constitution of this state or the Constitution of the United States." Nev. Rev. Stat. Ann. § 14.065

[2] International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

[3] Fulbright & Jaworski v. Eighth Jud. Dist. Ct., 131 Nev. 30, 35, 342 P.3d 997, 1001 (2015).

activities; and (3) the exercise of jurisdiction would be reasonable.[4]

### b.  Defendant lacks minimum contacts with Nevada

Defendant, Salt Lake Lodging, LLC is a Utah limited liability company and has no significant contacts with Nevada. Defendant does not own property, conduct business, have any employees, or maintain any offices in Nevada. Defendant has not purposefully availed itself of the privilege of conducting activities in Nevada, nor has it engaged in any conduct that would reasonably lead it to anticipate being haled into court in Nevada.

### c.  The Claims Do Not Arise from Defendant's Activities in Nevada

Plaintiff's claims do not arise out of or relate to any activities conducted by Defendant within Nevada. To the contrary, Plaintiff alleges that Plaintiff stayed at Defendant's place of business in Salt Lake City, Utah. There is no evidence that Defendant engaged in any actions in Nevada that are connected to the allegations in the Complaint. As such, the requisite nexus between the Defendant's activities and the Plaintiff's claims is absent.

### d.  Exercise of Jurisdiction Would Be Unreasonable

Requiring Defendant to litigate this matter in Nevada would be unreasonable and would impose an undue burden. Defendant has no meaningful connection to Nevada, and forcing Defendant to defend this action in a foreign jurisdiction would violate traditional notions of fair play and substantial justice, given the significant travel distance, lack of any meaningful connections to Nevada, and the financial burden involved. The interests of the State of Nevada and the convenience of the parties do not support the exercise of jurisdiction in this case.

//

//

[4] Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004).

**e.    Conclusion**

Based on the foregoing reasons, Defendant, Salt Lake Lodging, LLC respectfully requests that this Court grant its Motion to Dismiss for Lack of Personal Jurisdiction and dismiss Plaintiff's Complaint with prejudice.

DATED 28th day of October, 2024

CLARKSON & ASSOCIATES, LLC


/s/Satesh Sam Patel
Matthew D. Spring, Esq.
Nevada Bar No. 1172
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com
*Attorneys for Defendant, Salt Lake Lodging, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of October, 2024, a true and correct copy of the foregoing **DEFENDANT, SALT LAKE LODGING, LLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND SUPPORTING MEMORANDUM** was submitted electronically for filing and e-service with the Eighth Judicial District Court and electronic service on all registered users receiving service under NEFCR 9(b), via Eighth Judicial District Court's Electronic Filing and Service System.

CLARKSON & ASSOCIATES, LLC

 /s/ Satesh Sam Patel
Satesh Sam Patel

– 7 –

**Electronically Filed**
**10/28/2024 9:06 PM**
**Steven D. Grierson**
**CLERK OF THE COURT**

**IAFD**
Matthew D. Spring, Esq
Nevada Bar No. 11721
Satesh Sam Patel, Esq.
Nevada Bar No. 15081
CLARKSON & ASSOCIATES, LLC
340 Falcon Ridge Parkway, Suite 700A
Mesquite, Nevada 89027
162 North 400 East, Suite A–204
St. George, Utah 84770
(702) 345-7588 or (435) 634-1940
(435) 634-1942 fax
mspring@clarksonlegal.com
spatel@clarksonlegal.com

*Attorneys for Defendant, Salt Lake Lodging, LLC*

## IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE

## OF NEVADA IN AND FOR THE COUNTY OF CLARK

**\*\*\*\*\*\*\*\*\***

MARCY C., pseudonymously,

      Plaintiff,

    v.

MGM RESORTS INTERNATIONAL;
THE MIRAGE CASINO-HOTEL, LLC;
NEW CASTLE, LLC; TREASURE
ISLAND LV, LLC; PHILLIP E.
RUFFIN; CAESAR'S
ENTERTAINMENT, INC.; DESERT
PALACE, LLC; PARBALL NEWCO,
LLC; PHW LAS VEGAS, LLC; PHW
MANAGER, LLC; RIO PROPERTIES,
LLC; LAS VEGAS SANDS CORP.;
WYNN LAS VEGAS, LLC;
EXTENDED STAY AMERICA, INC;
ESA P PORTFOLIO L.L.C.; ESA P
PORTFOLIO OPERATING LESSEE
LLC; RED LION HOTELS
CORPORATION; SONESTA
INTERNATIONAL HOTELS
CORPORATION; WHC816, LLC; RL
SALT LAKE, LLC; CHOICE HOTELS
INTERNATIONAL, INC.; SALT LAKE
LODGING; CRRC PROPERTIES, LLC;
LA QUINTA FRANCHISING, LLC;
CPLG PROPERTIES, LLC,

      Defendants.

Case No.: A-24-903147-C
Dept.:    14

**INITIAL APPEARANCE FEE
DISCLOSURE**

– 1 –

Pursuant to N.R.S. chapter 19, as amended by Senate Bill 106, filing fees are submitted for parties appearing in the above-entitled action as indicated below:

**Salt Lake Lodging, LLC   $223.00**

**Total Remitted          $223.00**

DATED 28th day of October, 2024.
.

                                        CLARKSON & ASSOCIATES, LLC


                                         /s/Satesh Sam Patel
                                        Matthew D. Spring, Esq.
                                        Nevada Bar No. 1172
                                        Satesh Sam Patel, Esq.
                                        Nevada Bar No. 15081
                                        CLARKSON & ASSOCIATES, LLC
                                        340 Falcon Ridge Parkway, Suite
                                        700A
                                        Mesquite, Nevada 89027
                                        162 North 400 East, Suite A–204
                                        St. George, Utah 84770
                                        (702) 345-7588 or (435) 634-1940
                                        (435) 634-1942 fax
                                        mspring@clarksonlegal.com
                                        spatel@clarksonlegal.com
                                        *Attorneys for Defendant, Salt Lake Lodging, LLC*

– 2 –

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of October, 2024, a true and correct copy of the foregoing **INITIAL APPEARANCE FEE DISCLOSURE** was submitted electronically for filing and e-service with the Eighth Judicial District Court and electronic service on all registered users receiving service under NEFCR 9(b), via Eighth Judicial District Court's Electronic Filing and Service System.

CLARKSON & ASSOCIATES, LLC

 /s/ Satesh Sam Patel
Satesh Sam Patel

– 3 –

**Electronically Filed**
**10/29/2024 8:17 AM**
**Steven D. Grierson**
**CLERK OF THE COURT**

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**
**\*\*\*\***

| | |
|---|---|
| Marcy C, Plaintiff(s) | Case No.:    A-24-903147-C |
| vs. | |
| MGM Resorts International, Defendant(s) | Department 14 |

## NOTICE OF HEARING

Please be advised that the Defendant, Salt Lake Lodging, LLC's Motion to Dismiss For Lack of Personal Jurisdiction and Support Memorandum in the above-entitled matter is set for hearing as follows:

**Date:**        December 05, 2024

**Time:**        9:30 AM

**Location:**    RJC Courtroom 05C
Regional Justice Center
200 Lewis Ave.
Las Vegas, NV 89101

**NOTE: Under NEFCR 9(d), if a party is not receiving electronic service through the Eighth Judicial District Court Electronic Filing System, the movant requesting a hearing must serve this notice on the party by traditional means.**

STEVEN D. GRIERSON, CEO/Clerk of the Court

By:    /s/ Ondina Amos
Deputy Clerk of the Court

### CERTIFICATE OF SERVICE

I hereby certify that pursuant to Rule 9(b) of the Nevada Electronic Filing and Conversion Rules a copy of this Notice of Hearing was electronically served to all registered users on this case in the Eighth Judicial District Court Electronic Filing System.

By:    /s/ Ondina Amos
Deputy Clerk of the Court

Case Number: A-24-903147-C