1  MICHAEL C. KANE, ESQ.
   Nevada Bar No. 10096
2  **THE702FIRM INJURY ATTORNEYS**
   8335 West Flamingo Road
3  Las Vegas, Nevada 89147
   Telephone:    (702) 776-3333
   Facsimile:    (702) 505-9787
4  ***E-Mail:      service@the702firm.com***

5  GEOFFREY C. PARKER, ESQ.
   Nevada Bar No. 16952
6  JONATHAN L. HILTON, ESQ.
   Nevada Bar No. 16889
7  **HILTON PARKER LLC**
   7658 Slate Ridge Boulevard
8  Reynoldsburg, Ohio 43068
   Telephone:    (614) 992-2277
9  Facsimile:    (614) 927-5980
   ***E-Mail:      gparker@hiltonparker.com***

10

11                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**

12 McKENZIE KELLER,                          Case No. : 2:24-cv-2027

13       Plaintiff,
   vs.                                       **Judge James C. Mahan**

14 MGM RESORTS INTERNATIONAL;                **Mag. Judge Maximiliano D.**
   THE MIRAGE CASINO-HOTEL, LLC;             **Couvillier, III**
15 NEW CASTLE, LLC;
   TREASURE ISLAND LV, LLC;
16 PHILLIP E. RUFFIN;
   PARBALL NEWCO, LLC;                               **FIRST**
17 PHWLV, LLC;                               **AMENDED COMPLAINT**
   RIO PROPERTIES, LLC;
18 VENETIAN LAS VEGAS GAMING, LLC.;
   WYNN LAS VEGAS, LLC,
19
         Defendants.
20                                           **Jury Trial Demanded**

21

22                                **PARTIES**

23       1.      Plaintiff MCKENZIE KELLER ("**McKenzie**") is a natural person residing in Clark

   County, NV.  Plaintiff originally declared her intent to proceed under a pseudonym.  Her trafficker
24
   has since been convicted and imprisoned, so she has decided to proceed under her true name.
25
         2.      Defendant MGM RESORTS INTERNATIONAL ("**MGM**") is a Delaware
26
   corporation with its principal place of business in Clark County, NV.  On information and belief,
27

28

1  MGM operated the Mirage Las Vegas ("the Mirage") and the Excalibur Las Vegas ("the
2  Excalibur") casino resorts at all relevant times.

3      3.    Defendant THE MIRAGE CASINO-HOTEL, LLC ("**MCH**") is a Nevada limited
4  liability company with its principal place of business in Clark County, NV.  On reference, MCH
5  is a subsidiary of MGM and is the successor-in-interest of the defunct corporation, THE MIRAGE
6  CASINO-HOTEL.  If MGM did not directly operate the Mirage at all relevant times, then, on
7  information and belief, THE MIRAGE CASINO-HOTEL operated the Mirage at all relevant times
8  and MCH is liable as its successor-in-interest.

9      4.    Defendant NEW CASTLE, LLC ("**New Castle**") is a Nevada limited liability
10  company with its principal place of business in Clark County, NV.  On reference, New Castle is a
11  subsidiary of MGM.  If MGM did not directly operate the Excalibur at the relevant times, then, on
12  information and belief, New Castle operated the Excalibur at all relevant times.

13     5.    Defendant TREASURE ISLAND LV, LLC ("**TILV**") is a Nevada limited liability
14  company with its principal place of business in Clark County, NV.  On information and belief,
15  TILV—or an unknown predecessor-in-interest for whose acts TILV is liable—operated the
16  Treasure Island Las Vegas casino resort ("the Treasure Island") at all relevant times.

17     6.    Defendant PHILLIP E. RUFFIN ("**Ruffin**") is a natural person residing, on
18  information and belief, in Clark County, NV.  On reference, Ruffin is the owner and manager of
19  TILV.  On information and belief, Ruffin manages day-to-day operations at the Treasure Island.

20     7.    Defendant PARBALL NEWCO, LLC, ("**Parball**") is a Delaware limited liability
21  company with its principal place of business in Clark County, NV.  On information and belief,
22  Parball operated the Bally's Las Vegas ("the Bally's") at all relevant times.

23     8.    Defendant PHWLV, LLC ("**PHW**") is a Nevada limited liability company with its
24  principal place of business in Clark County, NV.  PHW operated the Planet Hollywood Las Vegas
25  ("the Planet Hollywood") at all relevant times.

26     9.    Defendant RIO PROPERTIES, LLC ("**Rio Properties**") is a Nevada limited
27  liability company with its principal place of business in Clark County, NV.  On reference, Rio
28  Properties operated the Rio Hotel & Casino Las Vegas ("the Rio") at all relevant times.

10.     Defendant VENETIAN LAS VEGAS GAMING, LLC ("**Venetian**") is a Nevada limited liability company with its principal place of business in Clark County, NV.  On reference, Venetian operated the Venetian Resort Las Vegas casino resort ("the Venetian") at all relevant times.

11.     Defendant WYNN LAS VEGAS, LLC ("**Wynn**") is a Nevada limited liability company with its principal place of business in Clark County, NV.  On reference, Wynn operated the Wynn Las Vegas casino resort ("the Wynn") at all relevant times.

12.     Defendants **MGM**, **MCH**, **New Castle**, **TILV**, **Ruffin**, **Parball**, **PHW**, **Rio Properties**, **Venetian**, and **Wynn** are referred to collectively herein as the "**Casino Defendants**."

13.     Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

**INTRODUCTION**
<u>Pimpology</u>

14.     One doesn't have to be chained up to be trapped in prostitution.  As most people recognize, women involved in prostitution nearly always feel trapped in a life they want to escape.[1]

15.     Despite this, in the popular imagination "sex trafficking" is something completely different from prostitution—something that only happens to sympathetic women.  In popular depictions of sex trafficking, the victim is nearly always a respectable girl from a good home who has been kidnapped off the street and who has been forced to sell her body solely by violence and the threat of violence.

16.     But, "[t]his popular image of sex traffickers and the victims of sex trafficking is almost completely wrong . . .  About the only thing Hollywood gets right is the brutal men, and even that is more complicated."[2]

17.     Most victims of sex trafficking aren't cuddly, and many are not obviously victims.  Few trafficking victims cry for help, because few see themselves as needing help.  Most are street

---

[1] Rachel Moran & Melissa Farley, *Consent, Coercion, and Culpability: Is Prostitution Stigmatized Work or an Exploitative and Violent Practice Rooted in Sex, Race, and Class Inequality?*, 48 ARCHIVES OF SEXUAL BEHAVIOR 1950-51 (2019).

[2] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA XII (2024).

savvy and tough as nails.  Many are flaky or personally difficult.  Nearly all have a wealth of past traumas, and it is usually those past traumas that make them vulnerable to exploitation.

18.    No little girl dreams of becoming a prostitute.  Most girls who do become prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion later.[3]  Nearly half are still children when they turn their first trick.[4]

19.    The individual risk factors for both "consensual" prostitution and sex trafficking overlap almost completely, including in both cases PTSD, trauma, childhood abuse and neglect, substance abuse, poverty and housing instability, foster care or dysfunctional family dynamics.[5]

20.    Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-90% of prostitutes are controlled by pimps.[6]

21.    The sex traffickers who exploit these women and girls call themselves pimps, but that is a distinction without a difference—the great majority of pimps use threats and physical violence to keep their "stable" of girls hardworking and loyal.[7]

22.    And physical violence is not the pimp's only tool of coercion.  As Ken Ivy, a Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*, pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

> Most hoes have low self-esteem for a reason.  A pimp looks for that weakness, and if it isn't on the surface, he brings that motherfucker out of them. . . .  Weakness is the best trait a person can find in

[3] *See* Jody Raphael, Jessica Alice Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).
[4] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, 2 JOURNAL OF TRAUMA PRACTICE 40 (2004) (42% of prostitutes in the U.S. started as children).
[5] Lara Gerassi, *From Exploitation to Industry: Definitions, Risks, and Consequences of Domestic Sexual Exploitation and Sex Work Among Women and Girls,* 25 JOURNAL OF HUMAN BEHAVIOR IN THE SOCIAL ENV'T 591-605 (2015).
[6] Farley, Melissa et al., *Online Prostitution and Trafficking,* ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-onlineprostitution-and-trafficking (collecting studies).
[7] Jody Raphael, Jessica Alice Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm); *See also* C. Williamson & T. Cluse-Tolar, *Pimp-controlled prostitution: Still an integral part of street life.* 8 VIOLENCE AGAINST WOMEN 1085 (2002) ("The extent to which women felt threatened by a pimp was, in part, a function of her evaluation of the likelihood that he will become physically violent.  This threat had been realized by all of the women in the study.").

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

4e4cv

someone they want to control.  You have to tear someone's ego down to nothing before they will start looking to you for salvation.[8]

23.    As those familiar with "the Life" know, "most hoes don't even like sex."[9]  Rather, they are usually in desperate situations and dealing with unresolved traumas that make them susceptible to manipulation and coercion by pimps who seek them out and purport to provide them with the love, care, and security that they've been deprived of.

24.    Still, even non-violent pimps leverage the ever-present threat of other pimps' violence to help coerce women they suspect of being independent sex workers—"renegades," in the language of the Life—into "choosing up" and becoming *their* girls.

25.    In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control of a naïve sex worker who made the mistake of speaking to him by telling her: "A solo ho without a pimp will soon be under pimp arrest or worse.  It's in your best interest to choose a pimp.  It's in your best interest to choose Pimpin' Ken."[10]

26.    It is standard practice for pimps to take all, or nearly all, of the money earned by the women and girls they control.  The pimps then use the money to pay for their victims' needs, but only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp.[11]

27.    To quote Ken Ivy again, "The more someone depends on you, the more power you have over them. To master someone completely, they have to depend on you for everything."[12]

28.    Common control techniques include retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to have CPS separate victims from their children if they disobey.

---

[8] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 22 (2008) ("Law 5: Prey on the Weak").
[9] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 77 (2008).
[10] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 79 (2008).
[11] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.
[12] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 20 (2008).

29.     Other methods of coercion include withholding food, sleep deprivation, and induced substance abuse/drug addiction. Courts have long recognized these tactics to be methods of coercion used in human trafficking.

30.     As Justice William J. Brennan explained, "drug addiction or the weakness resulting from a lack of food, sleep, or medical care . . . would not reappear with such depressing regularity [in trafficking cases] if they were ineffective." *United States v. Kozminski*, 487 U.S 931, 957 (Brennan, J., concurring) (collecting cases).

31.     Traffickers use substances to keep their victims too physically incapacitated to resist and to create a physical reliance on the trafficker out of fear of withdrawal.[13] Most sex trafficking victims—up to 84% according to one study—report their trafficker used substances to exploit them during their victimization period.[14]

32.     Of course, pimps use carrots as well as sticks.  Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like. But follow-through on even the short-term promises is rare, and retirement is all but unheard of.

33.     Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

34.     Many victims are also desperate to be loved.

35.     A "Romeo pimp" is a sex trafficker who deliberately feigns love and emotion connection to manipulate and control their victims. They knowingly misrepresent the nature of the relationship to induce victims into commercial sexual activity under false pretenses.

36.     Notably, these false promises of love, marriage, and retirement are just some of the many tools in a pimp's toolbox. They are not mutually exclusive from—and usually operate in tandem with—other methods of force, fraud, and coercion often including physical violence.

37.     All told, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and

---

[13] Planty L. Langton et al, *Sex Trafficking and Substance Use: Identifying High-Priority Needs Within the Criminal Justice System,* 9 RAND HEALTH QUARTERLY 14 (2022).
[14] Eastwood-Paticchio, Emma, *Addicted to You: Drug Addiction as a Means of Coercion*, HUMAN TRAFFICKING INSTITUTE (30 January 2019), *available at* https://traffickinginstitute.org/addicted-to-you-drug-addiction-as-a-means-of-coercion/ (noting prevalence of induced substance use in various human trafficking surveys and reports).

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

1    financial consequences. On reference, for more than half of all prostitutes these potential

2    consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

3        38.    For most women living it, the life of a pimp-controlled prostitute is a hellish prison

4    from which escape seems not just impossible, but unthinkable.  Contrary to the popular image,

5    pimp-controlled prostitution is what sex trafficking looks like in America today.

6        39.    Fortunately, federal law recognizes this complex reality.  The Trafficking Victims

7    Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

8          Whoever knowingly . . . recruits, entices, harbors, transports,
           provides, obtains, advertises, maintains, patronizes, or solicits by
9          any means a person . . . knowing, or . . . in reckless disregard of the
           fact, that means of force, threats of force, fraud, coercion described
10         in subsection (e)(2), or any combination of such means will be used
           to cause the person to engage in a commercial sex act.
11

12       40.    "Coercion," as used in the statute's definition of human trafficking, includes:

13         threats of serious harm to or physical restraint against any person;
           [or] any scheme, plan, or pattern intended to cause a person to
14         believe that failure to perform an act would result in serious harm or
           physical restraint against any person

15       41.    "Serious harm," as used in the statute's definition of coercion, means:

16         Any harm, whether physical or nonphysical, including
           psychological, financial, or reputational harm, that is sufficiently
17         serious, under all the surrounding circumstances, to compel a
           reasonable person of the same background and in the same
18         circumstances to perform or to continue performing commercial
           sexual activity in order to avoid incurring that harm.
19

20       42.    Reading the TVPRA's criminal provision together with its incorporated definitions,

21   human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of

22   "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel

23   a reasonable person *of the same background and in the same circumstances* . . . to continue

24   performing commercial sexual activity."

25       43.    Contrary to the comfortable myth spread by those who benefit from prostitution

26   occurring on their properties, there is no way to welcome any degree of "consensual prostitution"

27   without welcoming an even greater degree of sex trafficking.

28

44. This is because the vast majority of American prostitutes—on reference, at least three-quarters—are victims of sex trafficking within the meaning of the TVPRA.

45. In recent years, many American law enforcement agencies have "overhauled their approach to prostitutes, trying to be more respectful and compassionate in their interactions with them while still enforcing prostitution laws, recognizing all prostitutes are victims, and putting a greater focus on identifying and arresting their pimps."[15]

46. However, people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts. After all, the phrase "pimp slap" didn't enter the lexicon because people think pimps are cuddly and supportive.

47. Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture. In other words, most people know prostitutes are usually coerced, they just don't care.

48. In this case, McKenzie spent roughly four years under the control of a single trafficker who beat her constantly, threatened to separate her from her children, and insisted on controlling every penny she earned so that she remained totally dependent on him.

49. Sadly, McKenzie's story is far from unique—most prostitutes are subjected to similarly coercive treatment. As will be shown in the next section, casinos and casino workers have long been intimately familiar with the sex industry. They *know* most prostitutes are victims like McKenzie.

<u>Sex in Sin City</u>

50. From Prohibition to the present day, Las Vegas has long had a special reputation for catering to visitors' more disreputable tastes in ways no other city will.

51. By the 1950s, Las Vegas was famous for catering to male vice, especially in the forms of gambling and prostitution. "Sin City," as Vegas would soon be known, cultivated its image as *the* place for men to get away and enjoy themselves, free from the burdens of their families and the judgment of their communities.

---

[15] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA 35 (2024).

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

52. Although prostitution has technically been illegal in Clark County since 1931, easy access to commercial sex remained a key part of the city's allure for many male visitors.

53. This was only possible because Vegas happily tolerated a nominally illegal yet nearly omnipresent commercial sex sector. As late as the mid-1950s, the Clark County Sheriff still tolerated a brothel operating openly just a few miles off the Strip. Even after the last openly acknowledged Clark County brothels closed, commercial sex in Vegas remained a matter of police concern only when its consequences spilled over to people not involved in the industry.

54. Vegas's casinos openly welcomed, played into, and benefitted from Vegas's sexualized image. For decades, the standard cover motif of *Fabulous Las Vegas*—the City's premier entertainment publication—was a scantily clad woman posing next to a swanky casino.

55. Worse, Vegas casinos have long benefitted from welcoming a discreet and sanitized segment of the city's extensive sex trade onto their gaming floors and into their guest rooms.

56. As David Schwartz, Director of the Center for Gaming Research at UNLV puts it when discussing the 1950s, Vegas's casinos created a hierarchy of sex work that, "mirrors in many ways the socioeconomic world of the Strip. For high rollers, the select pit girls were available, much like comped rooms and other luxuries. For less well-connected players, the cocktail lounge prostitutes provided a similar service within the casino resort. Finally, for those who either had little money or whose predilections, violent or otherwise, could not be satisfied by the 'call girls' of the casino, streetwalkers represented the bottom of Las Vegas's prostitution hierarchy."[16]

57. This system of illegal yet openly tolerated prostitution greatly benefited the casinos because it ensured their male guests could always find the commercial sex that was one of Vegas's main draws, while at the same time it "kept the actual casino operators' involvement with prostitution to a minimum. At the most, casino managers would introduce high rollers to 'clean' prostitutes who would not attempt to rob or blackmail the player."[17]

58. At the same time, the technical illegality of prostitution meant, "the casino[s] could have a free hand in ejecting 'undesirable' prostitutes from the premises."[18]

---

[16] DAVID SCHWARTZ, SUBURBAN XANADU 61 (2013).
[17] DAVID SCHWARTZ, SUBURBAN XANADU 61 (2013).
[18] *Id.*

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

59.    Over the subsequent decades, shifting social mores and a push to broaden Vegas's appeal led casinos to demand greater discretion from the sex workers they invite in.

60.    But even today, the hierarchy the casinos pioneered decades ago remains largely intact:   A "clean" prostitute who doesn't make trouble is welcome in any casino on the Strip because they and their employees know cracking down on the trade would put them at a disadvantage versus more "tolerant" competitors.   And casino employees still frequently earn generous kickbacks for connecting guests to sex workers.

61.    The casinos also continue to broadcast obvious hints about the sexual services—and protection from prosecution—available to their guests.  Perhaps the best example of this is the world-famous slogan:  "What Happens Here, Stays Here" (a/k/a "What Happens in Vegas, Stays in Vegas").

62.    Created in 2003 under the aegis of the casino-dominated Las Vegas Convention and Visitors Authority ("LVCVA"), the slogan is intentionally ambiguous. Its creators' stated goal was to remind viewers that Vegas has more to offer than gambling, while leaving the details to their imaginations.  But given Vegas's longstanding reputation, everyone involved must have known it would be interpreted by many as a thinly veiled promise to protect sex tourists.

63.    Certainly, that's how UNLV sociology professor Barb Brents, who studies Nevada's sex industry, interprets it.[19]

64.    So, when Vegas's casinos authorized and funded these ambiguous-yet-risqué ads for over 15 years (through 2018), they knew the promise they were making and understood why the ads worked so well at attracting men.

65.    In other words, Defendants semi-deniably target advertisements toward sex tourists through the LVCVA, thereby turning their gaming floors into concentrated pools of demand for commercial sex.

66.    When traffickers bring their victims to Las Vegas to meet that demand, Defendants allow the most desirable of those victims to sell sex on their gaming floors and in their guest rooms,

---

[19] *See* Lopez, Sandy, Prostitution in Nevada has its advantages, experts say, LAS VEGAS REVIEW-JOURNAL (July 7, 2016), www.reviewjournal.com/local/local-las-vegas/downtown/prostitution-in-nevada-has-its-advantages-experts- say/.

1    while excluding any whom they deem undesirable—such as those who steal from guests or make

2    scenes—to create a curated sex tourism experience for their guests.

3        67.    More importantly, Vegas casinos continue to actively protect the male sex tourists

4    who flock to their gaming floors and nightclubs.  They do this by enforcing an unwritten rule that

5    the Las Vegas Metropolitan Police Department ("LVMPD") may not arrest "johns" inside casinos.

6        68.    This is not mere speculation.  Public records show that during the seven years from

7    2011 through 2017, the LVMPD made 998 arrests inside of Strip casinos that led to charges for

8    either soliciting or engaging in prostitution.  Of the 998 arrestees, 28 (2.8%) were males while 970

9    (97.2%) were females.

10       69.    Worse, of those 28 males who were arrested, only 5 (0.5% of the total) were johns.

11   The other 23 were themselves prostitutes.  In other words, between the beginning of 2011 and the

12   end of 2017, the LVMPD arrested prostitutes and johns at a 200-to-1 ratio inside Strip casinos.

13       70.    Such a disparity could not possibly have happened by accident.  Moreover, we

14   know it didn't happen by accident because LVMPD Sgt. Donald Hoier (Ret.) tells us as much.

15       71.    According to Sgt. Hoier—himself the former head of the LVMPD Vice Section's

16   pimp-focused, Pandering Investigations Team—everyone in Vice understands the "unwritten rule"

17   that you do not arrest johns inside of casinos because it's "bad for business."[20]

18       72.    Sgt. Hoier personally disapproved of this unwritten rule and, on one occasion, he

19   arrested a pair of johns and took them to a casino's security office "as he would a prostitute."

20       73.    Afterward, Sgt. Hoier reports that he was confronted by the casino's security

21   director, who threatened to "deny resources for future Vice operations (such as hotel rooms for

22   undercover stings)" if it happened again.[21]

23       74.    This unwritten rule against arresting johns in Vegas casinos helps Nevada retain its

24   status as the "symbolic center of the commercial sex industry."[22]

25

26

27   ---
     [20] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA 114 (2024).
     [21] Id.

28   [22] Heineman, Jennifer et al., Sex Industry and Sex Workers in Nevada, SOCIAL HEALTH OF NEVADA, 1 (2012),
     available at digitalscholarship.unlv.edu/social_health_nevada_reports/48.

75.    But it is no coincidence that Nevada is also the State with the second-highest rate of human trafficking.[23] Nor is it a coincidence that the FBI calls Las Vegas one of 13 "High Intensity Child Prostitution Areas."[24]

76.    Thanks to their long familiarity with the sex trade, the casinos are aware than most that the prostitutes whom they permit their guests to patronize—and whom their employees assist guests in patronizing—are, in fact, compelled to sell their bodies by force, fraud, or coercion.

77.    Moreover, on information and belief, each Defendant received a copy of the 2020 publication Casinos Combatting Human Trafficking by Truckers Against Trafficking, which explains how trafficking is carried out in plain sight on casino floors.[25]

78.    Thanks to that publication, they knew, by no later than 2020, that prostitution and sex trafficking look identical from the outside because most prostitution is sex trafficking, and that welcoming either the selling or the buying of sex necessarily creates more trafficking victims.

<u>Hospitable to Trafficking</u>

79.    The casino industry is not the only industry whose participants often knowingly profit from sex trafficking.

80.    By their nature, hotels tend to be located in close proximity to event spaces, airports and highways.  They offer temporary, anonymous, private, and cost-effective lodgings that are convenient for busy travelers.

81.    The same factors also make them prime venues for human trafficking.

82.    According to a 2018 Polaris Project report, three quarters (75%) of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and four fifths of victims who spent time in a hotel (i.e. 60% of all victims) had engaged in commercial sex inside of a hotel.

83.    Similarly, as of 2020, among all active federal prosecutions for human trafficking involving a completed sex act, over three quarters (77%) involved commercial sex at a hotel.

---

[23] *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state.
[24] *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.
[25] *See Casinos Combatting Human Trafficking*, TRUCKERS AGAINST TRAFFICKING (May 2020), *available at* https://truckersagainsttrafficking.org/wp-content/uploads/2020/02/BOTL-Casino-Bus-Training-Toolkit.pdf.

84.    As a result, hotel employees encounter victims of sex trafficking far more often than members of the general public.

85.    The hotel industry is aware, and has long been aware, that this problem runs rampant behind its guestroom doors.

86.    Sex trafficking is a problem that could not exist—not on anything like the same scale, at least—absent the willing cooperation of the hospitality industry, in whose rooms the great majority of the victims' suffering occurs.

**BACKGROUND**

McKenzie's Trafficking Begins

87.    By 2010, when McKenzie was 21 years old, she was a single mother was working two jobs to keep her daughter fed, clothed, and housed.

88.    Unfortunately, in about 2012 she started dating a man named Delquan Danford. The relationship was controlling and abusive from early in its existence, with Delquan frequently helping himself to money McKenzie had earned working as a dancer.

89.    Around the time McKenzie's second daughter was born in August of 2013, Delquan borrowed McKenzie's car for a work commute and fell asleep on the drive home, crashing it.

90.    This was a turning point in the relationship.  Delquan decided he was tired of working, so he quit his jobs and demanded that McKenzie support him.

91.    When McKenzie's insurance paid out for the damage to her car, he forced her to hand over the entire check to him.

92.    Unsatisfied with the life McKenzie could provide for him through legitimate employment, Delquan followed the advice of one of his cousins, who was an experienced pimp, and forced McKenzie to sell her body to support his habits.

93.    Delquan used a variety of coercive methods to force McKenzie to engage in commercial sex for his benefit.  He beat McKenzie regularly when she displeased him.  He carried guns and used them to threaten McKenzie.  He threatened to take McKenzie's children from her, or to report her to Child Protective Services ("CPS") so that CPS would take her children.

94.     Delquan was a sophisticated abuser. On the advice of his cousin, he deployed a mix of promises and threats, love bombs and beatings, to build a cage around McKenzie's mind.

95.     At first, Delquan forced McKenzie to bring home a nightly "trap" of $500.  Over time, his demands increased until McKenzie had to bring home $1,000 per night to avoid punishment.  Sometimes punishment meant emotional manipulation, but often it meant beatings.

96.     Delquan would post online ads offering McKenzie for commercial sex.  To keep McKenzie obedient, he would sometimes print the ads and threaten to show them to her family.

97.     Delquan also insisted on controlling every penny McKenzie earned, forcing her into a state of total dependence on him for even the most basic necessities.

98.     Soon after forcing her into prostitution, Delquan and his cousin took McKenzie to a tattoo parlor, where Delquan forced McKenzie to have his street name "Greezy" tattooed in large letters on her left forearm.

99.     Throughout McKenzie's trafficking, this "brand," as such tattoos are known in the Life, was conspicuously visible to anyone she interacted with.

100.    Branding is commonly used by pimps both to advertise and to reinforce their control over their victims.  In particular, brands serve to put other pimps on notice that their bearers already belong to someone.

101.    For nearly four years beginning in 2012, Delquan forced McKenzie to have sex with as many as ten men per day, almost every day.

102.    Delquan primarily forced McKenzie to walk the carpets inside casinos on the Las Vegas strip, but sometimes he would fly her to Salt Lake City, Utah or Lakewood, Colorado, near Denver and force her to sell herself from hotel rooms in those locations.

103.    When he sent McKenzie to other cities, Delquan would often remain behind in Las Vegas, keeping her children with him.  Delquan used her children as a lever to control her, both when they were together in Las Vegas and when he forced her to travel and leave them behind.

104.    Delquan would sometimes force McKenzie's children to call her and tell her that she was never going to see them again.

105.    On one occasion in 2015, McKenzie had an unsuccessful night looking for johns in the Rio.  Eventually, she gave up and headed home around five o'clock in the morning. When she got there, she found Delquan in her bed with another woman.

106.    When McKenzie told the other woman to leave, Delquan beat McKenzie into unconsciousness. When she regained consciousness, Delquan strangled her to the point that one of his friends staying in the home pulled away him, yelling, "You're going to kill her!"

107.    Around this time, Delquan became sure enough of his control over McKenzie—and unhappy enough with the burdens of childcare—that he handed McKenzie's children over to her mother (the children's grandmother).

108.    With that development, it became possible for McKenzie to contemplate escape, but it was not until an incident in 2016, in which McKenzie was nearly murdered by a john, that McKenzie's fear of the results of obeying Delquan finally outweighed her fear of disobeying him.

109.    McKenzie escaped Delquan's control for good in about April of 2016.

110.    As she came to terms with what she had been through, McKenzie began to seek justice against Delquan for what he'd put her and her children through.

111.    She approached the LVMPD vice squad first, but it had no interest in prosecuting Delquan because prosecuting pimps is more work than prosecuting their victims, because prosecuting pimps distracts from their primary mission of protecting the casinos', and because LVMPD vice lost its taste for prosecuting pimps following their catastrophic mishandling of cases against, *inter alia*, Jamal Rashid and Ocean Fleming.

112.    Fortunately, the authorities in Utah are made of sterner stuff.  They secured Delquan's extradition to Utah, where he pleaded guilty charges of aggravated assault and human trafficking.  He is now serving a sentence of up to 20 years in prison.

113.    McKenzie still suffers the physical and emotional aftereffects of this and other attacks, as well as of being forced to have sex with thousands of strange men during the years she was trafficked.

<u>McKenzie's Trafficking in Las Vegas</u>

114.    McKenzie was primarily trafficked in Las Vegas, Nevada.  During the years she was trafficked, she was forced to walk the carpet in most or all of the casinos on the Strip.

115.    On the Strip, McKenzie would "walk the carpet" and perform "out calls." "Walking the carpet" is analogous to "walking the street" but inside of a casino.  An "out call" is when a sex worker travels to the client's location, rather than the client coming to the sex worker.

116.    After her nights working on the Vegas strip, Delquan would strip search McKenzie when she returned to her house.

117.    Most frequently, McKenzie was forced to walk the carpet at the Mirage, the Treasure Island, the Bally's, the Planet Hollywood, the Rio, the Excalibur, the Venetian, and the Wynn.

118.    McKenzie sold sex frequently at each of the Casino Defendants' listed casinos, including on multiple occasions each during late 2014 and early 2015.

119.    Between November of 2014 and the last time she was forced to sell sex in Las Vegas (in early- or mid-2015), McKenzie sold sex in the Mirage between 7 and 10 times.

120.    During the same period, she sold sex in the Treasure Island approximately 10 times.

121.    During the same period, she sold sex in the Bally's approximately 4-5 times.

122.    During the same period, she sold sex in the Planet Hollywood about 3-4 times.

123.    During the same period, she sold sex in the Rio approximately twice.

124.    During the same period, she sold sex In the Excalibur approximately 4-5 times.

125.    During the same period, she sold sex in the Venetian approximately 6-8 times.

126.    During the same period, she sold sex in the Wynn approximately 10 times.

127.    During the two years immediately preceding this period, she was forced to sell sex at the Casino Defendants' properties likely hundreds of times in total, including numerous instances at each Casino Defendant's property.

128.    Throughout her trafficking, whenever McKenzie engaged in commercial sex in a given casino, she typically did so multiple times in a single night.  For example, the two instances

1    that occurred in the Rio likely occurred on the same night, and the ten instances at the Wynn likely

2    occurred across three to five nights.

3        129.    Delquan beat McKenzie so frequently throughout her trafficking that she regularly

4    walked the carpet with visible bruises.  On information and belief, she sported black eyes or other

5    visible bruises on the floor of each defendant casino during the relevant period.

6        130.    When walking the carpet and trying to attract customers, McKenzie would sit at

7    bars or at slot machines near the elevators leading to guest rooms.

8        131.    McKenzie frequently succeeded in attracting johns at the Casino Defendants'

9    properties.  These johns had no difficulty identifying McKenzie as a sex worker based on her attire

10   and the way she loitered at bars or near the elevators.

11       132.    Longtime casino employees are well known for their ability to identify sex workers.

12   Not only do they witness the patterns of sex worker and customer behavior night after night, they

13   also have a financial incentive to hone their skills because sex workers rarely gamble or tip much,

14   so time spent attending to sex workers is time ill-spent from the employees' perspectives.

15       133.    Many of the employees in the bars and on the gaming floors of each of the Casino

16   Defendants' properties would have been longtime casino employees.  These employees would

17   have been more experienced in and skilled at identifying sex workers than most of the men who

18   approached McKenzie for commercial sex.

19       134.    It is therefore virtually certain that employees of each of the Casino Defendants

20   identified McKenzie as a sex worker on numerous occasions, including several occasions each

21   during late 2014 and 2015.

22       135.    On at least one occasion each during the period from November 2014 through early-

23   /mid-2015, bartenders at the Planet Hollywood, the Mirage, and the Treasure Island connected

24   McKenzie with casino guests who were looking to purchase commercial sex, either by directing

25   the sex-tourist guests to speak to McKenzie or by pointing sex-tourist guests out to McKenzie.

26       136.    The bar staff at each of these locations (the Mirage, Treasure Island, and Planet

27   Hollywood) knew that McKenzie was selling sex within their establishments, but rather than report

28   her, they aided in her exploitation because they understood that doing so was good for business.

137.    McKenzie made sure to give generous tips to bar staff who assisted her in this way, often tipping $80-100 after consuming only a few drinks.

138.    Sometimes McKenzie also performed out calls at casinos, meaning Delquan would post (or force her to post) online advertisements for commercial sex, and she would then meet buyers in their casino hotel rooms for commercial sex.

139.    On several occasions each, McKenzie needed to get upstairs to the guest rooms in the Wynn and the Treasure Island to meet johns.  Although elevator access required a room key, she was repeatedly able get in by tipping the staff members watching the elevators.  This occurred at least once at each of the Wynn and the Treasure Island after the start of November 2014.

140.    On one occasion, while McKenzie was walking the carpet at the Excalibur, a security staff member dragged McKenzie into a back room. He then pulled a condom out of his pocket and told her that if she did not have sex with him, he would have her sent to jail.

141.    On another occasion, after McKenzie had a financial disagreement with a john at the Treasure Island and left the john's room carrying the john's iPad, the john chased her through the casino and grabbed her by her hair.

142.    Although Treasure Island security knew that the john had just purchased commercial sex from McKenzie on their property, Treasure Island security profusely apologized to the john and promised to "comp" his room before handing McKenzie over to the LVMPD.

143.    On reference and belief, it is common practice—both at the Treasure Island and at the Casino Defendants' other properties—for security staff to treat prostitutes as criminals even while they treat the johns who bring them in as honored guests.

144.    In about 2012, a similar incident occurred at the Wynn.  McKenzie went upstairs with a john and engaged in commercial sex.  They were caught on camera travelling together to the john's room, and she was caught on camera leaving less than two hours later.

145.    McKenzie and the john had a dispute about payment, which the john apparently reported to the Wynn's security staff.  When McKenzie returned to the Wynn the next day, she was immediately detained by security.

146.     Security attempted to call the john from the previous day, but he did not answer. Security told McKenzie that if he had answered, he would have been invited down to the holding area to give a statement so that she could be charged with larceny.  But because he didn't answer, when she was handed over to the LVMPD she was only charged with trespassing.

147.     Although security was eager to trespass McKenzie for selling sex, they never even contemplated trespassing the john for buying sex.

148.     Wynn security knew, or should have known: (1) that McKenzie and the john had engaged in commercial sex; (2) that most prostitutes—especially those sporting prominent brands with names like "Greezy"—are trafficking victims; and thus (3) that the john had just "patronized" McKenzie "in reckless disregard" of the likelihood she was being coerced.

149.     In other words, Wynn security knew the john had trafficked McKenzie within the meaning of TVPRA § 1591.

150.     Nevertheless, the Wynn continued to rent the john a room where he could bring other victims and to welcome the john on its gambling floor.  Thus, Wynn knowingly profited from continuing to participate in a venture (the john's Las Vegas vacation) that it knew had engaged in a violation of § 1591.

<u>The Casino Defendants' Surveillance and Knowledge</u>

151.     On information and belief, during the time period of McKenzie's trafficking, all of the Casino Defendants used sophisticated facial recognition software, with which they monitored their properties' omnipresent security cameras, particularly at casino entrances.

152.     Las Vegas casinos, including those of Defendants, have long been at the cutting edge of surveillance technology.  "With increased competition comes the technocratic race to modernize facilities, generate revenue, and minimize losses.  Thus, it was only a matter of time before casinos employed some of the most elaborate surveillance and security systems in the world."  Gabel, Jessica, *CSI Las Vegas:  Privacy, Policing, and Profiteering in Casino Structured Intelligence*, UNLV Gaming Law Journal, Vol. 3:39, at 40 (Spring 2012).

153.    One major purpose of this facial recognition software was to assist their security staff in turning away persons the Casino Defendants considered undesirable by flagging such persons wherever they were spotted in the casinos and alerting security personnel.

154.    On information and belief, each Casino Defendant's facial recognition software was able to (and did) recognize and flag McKenzie as a likely sex worker.

155.    Even if McKenzie was not flagged by the facial recognition software, each Casino Defendant's security staff would have witnessed dozens of instances of McKenzie following a guest upstairs to his room, staying in his room for an hour or two, and then heading back downstairs alone.  For each Casino Defendant, several of these instances occurred during late 2014 or 2015.

156.    On information and belief, security personnel at each Casino Defendant's properties became aware on multiple occasions that McKenzie was visiting (or had just visited) their casino for the purpose of engaging in commercial sex.

157.    Additionally, because the Casino Defendants' security employees were perforce more familiar with the sex industry than members of the public, they would have been aware that most prostitutes—especially those with visible brands like McKenzie—are victims of coercion.

158.    Thus, on information and belief, the employees knew McKenzie was being trafficked.

159.    Nevertheless, the employees turned a blind eye to McKenzie's plight because to do otherwise would have potentially upset their valued sex-tourist guests.

160.    On information and belief, this willful blindness was intentionally fostered by the Casino Defendants in order to please their clientele and so pad their bottom lines.

161.    Additionally, this willful blindness was likely encouraged by the Casino Defendants' desire to draw a sharp line between "consensual prostitution" and human trafficking that in a way that incorrectly places nearly all prostitutes on the "consensual" side of the line.

162.    The Casino Defendants' welcoming attitude toward sex trafficking extended to turning their own blind eyes toward the tendency of their employees to take tips in exchange for assisting traffickers and their victims in selling commercial sex.

163.    By openly tolerating such behavior, the Casino Defendants both pleased their sex tourist guests and made it possible for them to undercompensate certain guest-facing employees like bartenders and elevator minders.

164.    On information and belief, to the extent that the Casino Defendants gave their employees any training on recognizing human trafficking, that training strongly emphasized the idea that most prostitution is consensual, and thus that employees should only take action (or report to their superiors) if they witnessed clear direct evidence of severe physical abuse.

Evidence of the Casino Defendants' Embrace of Sex Trafficking

165.    The Casino Defendants are loyal heirs to a longstanding tradition of Strip casinos welcoming sex tourism to pad their bottom lines, as further described in the Introduction to this Complaint, *supra*.

166.    Las Vegas Metropolitan Police Department ("LVMPD") arrest records and public-facing guest reviews of Defendants' properties both make clear that Defendants knowingly and intentionally encourage sex tourism inside their properties.

167.    We first consider what LVMPD records can tell us.

168.    Prostitution is a crime where it very much "takes two to tango."  In theory, then, roughly equal numbers of men and women should be arrested for and charged with soliciting or engaging in prostitution.

169.    Indeed, when one considers that most prostitutes are coerced into sex work, one might reasonably hope that more men than women would be charged with prostitution offenses.

170.    Sadly, the world is rarely fair to sex workers.  In reality, the LVMPD arrests considerably more women than men for soliciting or engaging in prostitution.

171.    Specifically, during the seven-year period from the beginning of 2011 through the end of 2017, the LVMPD made 1,053 arrests leading to charges for soliciting/engaging in prostitution inside the primary Zip Code for the Las Vegas Strip, namely Zip Code 89109.

172.    Of those 1,053 arrests, 998 were made inside of Strip casinos, and 55 were made somewhere other than inside a Strip casino.

173.    Of the 55 arrests made outside of casinos, 20 of the arrestees were male, and 35 were female.  Thus, **36% of all non-casino arrestees were male, and 64% were female**.

174.    A female-to-male arrest ratio of almost 2:1 seems unfair—indeed, *is* unfair—for a crime that almost always involves one perpetrator of each gender.  But compared to the gender ratio for in-casino prostitution arrests, a gender ratio of 2:1 seems practically utopian.

175.    Of the 998 arrests leading to charges for soliciting/engaging in prostitution made inside Strip casinos from 2011 to 2017, 28 of the arrestees were male, and 970 were female.  Thus, **2.8% of all in-casino arrestees were male, whereas 97.2% were female**.

176.     In other words, during the period when McKenzie was trafficked in Defendants' properties, men who solicited prostitutes inside Strip casinos were over ten times less likely to face prosecution than men who solicited prostitutes on the Strip outside of a casino.

177.    Moreover, all but five of the men arrested inside strip casinos were themselves prostitutes, so **the prostitute-to-john ratio among arrestees was 993-to-5, or nearly 200-to-1**.

178.    This did not happen—and could not have happened—by accident.  Instead, it is almost certainly the result of two factors, both of which are fully under the control of the casinos themselves:

    a.    Although casinos regularly report undesirable sex workers and trafficking victims to the LVMPD and assist in their arrests, the same casinos never—or at least very, very rarely—do the same for the many male guests whom they witness soliciting commercial sex; and

    b.    Casinos discourage the LVMPD officers from arresting male guests on their own initiative using persuasion, cajolery, and threats (whether explicitly or implicitly) to withhold cooperation with LVMPD stings.

179.    In this way, Las Vegas casinos intentionally create an environment where the legal penalties for sex tourism apply exclusively or almost exclusively to the women victimized by it.

180.    They do this for the same reason they created "What happens here, stays here"— because they understand that the prospect of consequence-free sex tourism is one of Las Vegas's major draws, particularly for the casinos' prime demographic of older, wealthier men.

181.    This is not merely an inference based on public records.  According to Sgt. Donald Hoier (Ret.), who was the head of the LVMPD Vice division's Pandering Investigations Team

1  during much of the time McKenzie was trafficked, it was common knowledge among Vice officers

2  that johns were not to be arrested on casino property.

3      182.    Moreover, according to Sgt. Hoier, on the one occasion that he arrested johns inside

4  of a casino, he was told by the casino's head of security that if he did so again, the casino would

5  withhold cooperation with future Vice efforts.

6      183.    The Mirage, the Treasure Island, the Bally's, the Planet Hollywood, the Excalibur,

7  the Venetian, and the Wynn are all located within Zip Code 89109 such that they are covered by

8  the same public records data described above.  The Rio is in Zip Code 89103, and it is thus covered

9  by data obtained via a separate, subsequent public records request.

10     184.    Between the start of 2011 and the end of 2017, the sex breakdown for arrests for

11 soliciting/engaging in prostitution inside of the Casino Defendants' properties was as follows:

| Casino | Total Arrestees | Male Arrestees | Female Arrestees | Percent Male Arrestees |
|---|---|---|---|---|
| The Bally's | 1 | 1 | 0 | 100% |
| The Excalibur | 2 | 0 | 2 | 0% |
| The Mirage | 65 | 0 | 65 | 0% |
| The Planet Hollywood | 150 | 5 | 145 | 3.33% |
| The Rio | 18 | 2 | 16 | 11.11% |
| The Treasure Island | 17 | 0 | 17 | 0% |
| The Venetian | 83 | 0 | 83 | 0% |
| The Wynn | 53 | 2 | 51 | 3.77% |

18     185.    In other words, during the time when McKenzie was trafficked inside their

19 properties, the Excalibur, the Mirage, the Treasure Island, and the Venetian provided even more

20 protection from prosecution to their sex-tourist guests than did the average Strip casino.

21     186.    Similarly, the Planet Hollywood, the Rio, and the Wynn all provided similar

22 degrees of protection to their sex-tourist guests as compared to the average Strip casino.

23     187.    Meanwhile, the Bally's stands because it was the location of only a single arrest

24 leading to charges for soliciting/engaging in prostitution during the entire seven-year period, which

25 implies that the Bally's had an unusually high tolerance for sex work even for a Las Vegas casino.

26     188.    We now turn to the story told by public-facing guest reviews of Defendants'

27 properties found on Tripadvisor.

28     189.    Relevant reviews of the Bally's include:

a. One guest awarded one out of five stars, explaining that he was "Propositioned by prostitutes twice IN THE HALLWAY around 7:00 AM." He further explained that he had "[n]otified security in person. Prostitute was later sleeping on the brown sofa outside of the elevator; obviously, security did nothing. If you stay on the 25th floor and want to sit on the sofa, consider sanitizing it first."

b. Another guest awarded two out of five stars in a review entitled "Prostitutes Galore," saying, "I don't believe in taking kids to Vegas but if you do please do not bring them to Bally's because of the prostitutes. I don't mean just one or two, I mean we counted at least 6 differnet girls that we saw. Bring platform shoes, short dresses, usually sat by themselves until they would see a man by themselves. I saw this happen many times. Shame on Bally's for allowing this to go on."

c. Another guest awarded three out of five stars and noted the presence of "'in your face' prostitutes," which he said were, "fun to watch, but my goodness, clean it up a little."

d. Another guest awarded three out of five stars and said, "After 2AM, make a b-line to your room; to avoid the drunks and prostitutes."

e. Another guest awarded five stars and said, "I was propositioned by a woman in the casino, with the standard, 'Are you here for a conference?' line. Watch out for the women with the small purses and who drink coffee in the middle of the night. Those are definite tip-offs that you are dealing with a 'professional'. FYI, prostitution is ILLEGAL in Clark County. Fair warning."

190.    All of the Bally's reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016. In total, at least sixteen currently-available Tripadvisor reviews of the Bally's reference the high prevalence of sex work on the property.

191.    Relevant reviews of the Excalibur include:

a. One guest awarded one out of five stars in a review entitled "Stay Away." According to the guest, "This hotel is filled with Prostitutes," and "Non hotel guests have access to elevators and can easily access hotel rooms."

b. Another guest awarded three out of five stars and described seeing "a hand full of prostitutes open[ly] discussing [the] cost of their services" in the casino.

c. Another guest awarded three out of five stars and stated that "the amount of prostitutes working the game floor was shocking."

d. Another guest awarded one out of five stars and stated, "I have never seen so many hookers in a casino.

192.    Although all of the Excalibur reviews quoted above were left after McKenzie's trafficking ended, it is highly likely that similar reviews were available on various online platforms

prior to and during McKenzie's trafficking, and that those reviews have simply been scrubbed from review sites or have otherwise become unavailable during the intervening decade.

193.    Since 2017 (the date of the earliest such review still available online), nearly two dozen Tripadvisor reviewers have mentioned the prevalence of prostitution at the Excalibur.

194.    On information and belief, before they were scrubbed from the internet, the reviews of the Tropicana included numerous similar testimonials about the high prevalence of prostitution and the Tropicana's tolerance thereof.

195.    Relevant reviews of the Mirage include:

a.    One guest awarded three out of five stars, complaining that "we were very surprised to see . . . a GROUP of prostitutes (they looked the part, but more importantly, the employees verified this and complained about their presence) were there for an extended amount of time on a TUESDAY night."

b.    Another guest awarded four out of five stars and advised, "Two nightclubs downstairs if you like to party, just be prepared you will be approached by hookers."

c.    Another guest awarded five stars and called the Mirage the "best place I ever stayed in," before explaining that he had "spent too much money . . . even bought art work and three hookers too."

d.    Another guest awarded three out of five stars, saying, "things change at night and the Mirage became a different place. . . . At 1:30 AM there were prostitutes everywhere on the casino floor hitting on me. A bit disturbing."

e.    Another guest awarded five stars but complained, "Only one negative, I was hit on by a teenage hooker.  I won't say it was a problem, but I did feel uncomfortable.  I guess that's just Vegas."

196.    All of the Mirage reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016.  In total, at least sixteen currently-available Tripadvisor reviews of the Mirage reference the high prevalence of sex work on the property.

197.    Relevant reviews of the Planet Hollywood include:

a.    One guest awarded two out of five stars, stating, "The nightclub is full of prostitutes that look like they may be teenagers….we thought it was tasteless for an upscale nightclub to allow this sort of thing."

b.    Another guest awarded one out of five stars, complaining, "There $.02 prostitutes roaming free all over the casino floor without reservation attempting to get a date."

c.  Another guest awarded five stars but stated, "The only complaint I have is the hookers. I was approached three times, once by the rest rooms, once by the elevators, and once while playing a machine."

d.  Another guest awarded one out of five stars, stating, "The casino was absolutely PACKED with HOOKERS . . . PH was the absolute low point of my trip. PH is a money sucking black hole full of hookers."

e.  Another guest awarded four out of five stars in a review titled simply, "HOOKERS." He explained, "This place is crawling with hookers/escorts. Plan on running from them if you play machines."

198.  All of the Planet Hollywood reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016. In total, at least forty currently-available Tripadvisor reviews of the Planet Hollywood reference the high prevalence of sex work on the property.

199.  Relevant reviews of the Rio include:

a.  One guest awarded three out of five stars in a review entitled, "Rio is a fight between good and evil." In the "Good" section of the review, he wrote, "There were several blatant hookers actively looking to pick up Johns."

b.  Another guest awarded one out of five stars and wrote, "there were hookers waiting by the elevators at night propositioning the men as they went to their rooms . . . Security was very lax."

c.  Another guest awarded five stars but said, "I've never seen so many 'working ladies'; flagrantly strutting their stuff in the open . . . you can tell these ladies were amateurs. Don't know if there is a hooker school anywhere but these ladies should attend. If I was a cop I could have arrested 5 women the first night. No discretion whatsoever."

d.  Another guest awarded three out of five stars in a review entitled, "Some rumors are true but rooms are nice." In it, he explained, "The main thing I had heard about Rio is that it's full of hookers. Yes, quite a few do come out at night but nowadays you find a lot of that in several of the hotels. We overheard security telling someone that had complained about them that every night they get detained and then they just pay a fee and come right back."

e.  Another guest awarded three out of five stars, explaining, "What was once a fun energetic upbeat place to hang out has turned into a dated, boring hangout for prostitutes trolling the bars."

200.  All of the Rio reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016. In total, at least eighteen currently-available Tripadvisor reviews of the Rio reference the high prevalence of sex work on the property.

201.  Relevant reviews of the Treasure Island include:

a.    One guest awarded three out of five stars, saying, "I'm not a huge fan of Vegas in general as I think it has gone way overboard with selling sex. In the past, TI was one of the few places on the strip where I would not be overwhelmed with it. However, while attending a SHOTShow this year, that was no longer the case. There were prostitutes in the casino and in the bars everywhere and security didn't seem to care."

b.    Another guest awarded three out of five stars and explained, "My biggest beef with the property, however, has nothing to with the rooms, but with the lax security and management that allows the casino floor to be over run with prostitutes and pimps once the sun goes down."

c.    Another guest awarded three out of five stars in a review entitled, "Great for prostitutes."  The guest listed his pros and cons for the casino, and among the "pros" was the statement, "Tons of prostitutes.  If you love prostitutes, this is the place for you."

d.    Another guest awarded one out of five stars and complained, "too many low life prostitutes through out hotel can't walk from elevator to bar without having several very young girls try to hook you for their trick."

e.    Another guest awarded three out of five stars, saying her "biggest gripe" was that there was "no security anywhere and ALOT of prostitution (though I know it's legal there)."

202.   All of the Treasure Island reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016.  In total, at least sixteen currently-available Tripadvisor reviews of the Treasure Island reference the high prevalence of sex work on the property.

203.   Relevant reviews of the Venetian include:

a.    One guest awarded five stars, saying "[t]he only draw back to my stay was seeing hookers coming up the elevator with us…but I guess what they say is true…What happens in Vegas STAYS in Vegas!"

b.    Another guest awarded three out of five stars because "[t]his place is infested with prostitutes from late at night to early in the morning.  They're in the casino among the slots and the bar.  They're in the parking garage with their drivers.  They're on the sidewalk and plaza.  Everywhere."

c.    Another guest awarded four out of five stars, having deducted a star because "[m]y husband has been propositioned by prostitutes the last 2 times we have stayed at the Venetian . . . these pros were very easy to spot and kept going up man to man throughout the casino.  I wish security would address this issue.  It is quite obvious."

d.    Another guest awarded four out of five stars but explained, "[t]his is a 5 star resort and prostitutes were plentiful at the casino.  Security seemed to tolerate them.  I was accosted to many times to count while sitting at the slot machines.  I'm open minded, but it was excessive."

e.    Another guest awarded five stars, saying "While I was walking through the hotel . . . I received as many as 5-7 prostitutes hitting on me. So as a joke when went up to the room we called the front desk and asked if they could send up some hookers. They were more than happy to help us. We said no thank you and hung up laughing." The Venetian's Hotel Manager – Guest Relations responded to this review with an apology for the unwanted propositions, but he neither apologized for nor attempted to investigate the front desk personnel who offered to "send up some hookers."

204.    All of the Venetian reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016. In total, at least twelve currently-available Tripadvisor reviews of the Venetian reference the high prevalence of sex work on the property.

205.    Relevant reviews of the Wynn include:

a.    One guest awarded three out of five stars, stating, "we found in the elevator lobbies, drunk people, prostitutes bargaining with customers and so on."

b.    Another guest awarded five out of five stars in a review titled "Wynn Win Situation," in which she described the casino as "crawling with hookers" and complained that when she complained to security about her husband being propositioned, security "just laughed it off." She concluded, "I know this is something that maybe lots of men look for so it's just another service provided but there should be another way of doing it that's not so obvious or crude."

c.    Another guest awarded four out of five stars in a review titled "Hookers Welcome Here," where they complained of "hookers fighting in the halls."

d.    Another guest awarded two out of five stars and said, "the strip is now loaded with prostitutes day in and day out. I am not a prude, but come on Wynn, get them out of the casino!!!" She continued, "in the morning security guards were questioning 'hookers' who had just finished servicing some clients . . . Why don't they stop them from going up the elevators before they service their clients or get them to turn over their clients names…...then band [sic] them from the hotel."

e.    Another guest awarded three out of five stars and said, "I must share that you can easily identify the 'escorts' after nightfall, but we had fun picking them out of the crowd."

206.    All of the Wynn reviews quoted above were left before or during McKenzie's trafficking from 2012 through 2016. In total, over forty currently-available Tripadvisor reviews of the Wynn reference the high prevalence of sex work on the property.

## COUNT I: 18 U.S.C. § 1595 ("TVPRA")

207.    Plaintiff incorporates each foregoing and subsequent allegation.

208.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a)

1 and is entitled to bring a civil action under 18 U.S.C. §1595.

2      209.    Through their acts and omissions described above, the Casino Defendants are each

3 "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a), and they

4 are thus liable under 18 U.S.C. § 1595.

5      210.    More specifically, the Casino Defendants each "harbor[ed]" and "maintain[ed]"

6 Plaintiff within the meaning of § 1591(a), and the Casino Defendants additionally "provide[d]"

7 Plaintiff.

8      211.    Through their acts and omissions described above, the Casino Defendants each

9 benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that

10 they knew or should have known earned money from sex trafficking, and they are thus liable under

11 18 U.S.C. § 1595.

12      212.    For example, the Casino Defendants each participated in the "venture" of operating

13 their respective casino when they knew or should have known that their casino had engaged in

14 violations of § 1591.

15      213.    Additionally, the Casino Defendants—and particularly Wynn—participated in the

16 "venture[s]" of their sex tourists guests' Las Vegas vacations, despite knowing that their guests

17 were engaged in "patronize[ing]" trafficking victims in violation of § 1591.

18      214.    Plaintiff is therefore entitled to bring an action against each Defendant for damages

19 under 18 U.S.C. § 1595.

20                              **PRAYER FOR RELIEF**

21      WHEREFORE, Plaintiff respectfully requests judgment as follows:

22      **a.**  Awarding Plaintiff all available compensatory damages for each cause of action,

23              including but not limited to past and future medical expenses; past and future lost

24              wages and loss of earning capacity; past and future emotional distress;

25              consequential and/or special damages; and all available noneconomic damages,

26              including but not limited to pain, suffering, and loss of enjoyment of life;

27      **b.**  Disgorgement of profits and/or restitution;

28      **c.**  Punitive damages, attorneys' fees, and expenses;

1      **d.** The costs of this action;

2      **e.** Pre- and post-judgment interest; and

3      **f.** Any other relief the Court or jury deems appropriate.

4

5

6     DATED this 1st day of August, 2025.

                */s/ Geoffrey C. Parker*

7                 GEOFFREY C. PARKER, ESQ.

8                 Nevada Bar No. 16952
                JONATHAN L. HILTON, ESQ.

9                 Nevada Bar No. 16889
                HILTON PARKER LLC

10                Ohio Bar No. 0096049
               7658 Slate Ridge Boulevard

11                Reynoldsburg, Ohio 43068

12                **THE702FIRM**
                MICHAEL C. KANE, ESQ.

13                Nevada Bar No. 10096
                BRADLEY J. MYERS, ESQ.

14                Nevada Bar No. 8857
                JOEL S. HENGSTLER, ESQ.

15                Nevada Bar No. 11597
                THE702FIRM INJURY ATTORNEYS

16                400 South 7th Street, Suite 400
                Las Vegas, Nevada 89101

17                *Attorneys for Plaintiff McKenzie Keller*

18

19            **<u>DEMAND FOR JURY TRIAL</u>**

20     Plaintiff McKenzie Keller, by and through her attorneys of record, hereby demands a jury

21 trial of all issues in the above matter.

22     DATED this 1st day of August, 2025.

                */s/ Geoffrey C. Parker*

23                 GEOFFREY C. PARKER, ESQ.

24                Nevada Bar No. 16952
                JONATHAN L. HILTON, ESQ.

25                Nevada Bar No. 16889
                HILTON PARKER LLC

26                Ohio Bar No. 0096049
                7658 Slate Ridge Boulevard

27                Reynoldsburg, Ohio 43068

28                MICHAEL C. KANE, ESQ.
                Nevada Bar No. 10096

1    BRADLEY J. MYERS, ESQ.
     Nevada Bar No. 8857
2    JOEL S. HENGSTLER, ESQ.
     Nevada Bar No. 11597
3    THE702FIRM INJURY ATTORNEYS
     400 South 7th Street, Suite 400
4    Las Vegas, Nevada  89101

5    *Attorneys for Plaintiff McKenzie Keller*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28